THIRD DIVISION
January 27, 2010

No. 1-07-2231

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| HERMIZ GABRIEL, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE QUINN delivered the opinion of the court:

Following a bench trial, defendant was found guilty of aggravated battery with a firearm based on an accountability theory and sentenced to seven years in prison. On appeal, defendant contends that: (1) the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm where the identification testimony was unreliable and defendant presented three alibi witnesses; (2) the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm based on an accountability theory; (3) trial counsel was ineffective by failing to file a motion to sever his bench trial from the jury trial of codefendant Arnold Castillo, failing to challenge the admissibility of the eyewitness identification testimony, and failing to investigate and impeach the States' witnesses; and (4) the circuit court erred in

denying his motion for a new trial based on newly discovered evidence. For the following reasons, we affirm.

BACKGROUND

At trial, Candido Moreno testified that on September 14, 2004, Luis and Juan Villalobos picked him up at his home to show him new rims that Juan bought for his black Denali truck. Candido testified that they drove to the home of Luis and Juan's mother, located at 6331 North Rockwell Street in Chicago, Illinois. Candido testified that Juan drove his truck, while Candido sat in the front passenger seat and Luis sat in the backseat behind Juan. Candido testified that they stopped along the way to purchase a six-pack of beer. Candido and Luis each drank two beers in the truck while Juan drove and did not drink any beer.

At about 9:45 p.m., Candido testified that they approached the intersection of Rosemont and Fairfield Avenues, which was two blocks from their destination. Candido testified that as the truck approached the stop sign at the intersection, he saw a group of 15 to 20 individuals. The group surrounded the truck, flashed gang signs, and yelled "King love." Candido testified that Luis argued with codefendant Arnold, who flashed a tattoo on the left side of his neck. Candido also observed defendant standing on the passenger side of the truck and saw defendant pull a gun halfway out of his left pocket. Candido told Luis that they should leave and Juan drove them to his mother's house, where they parked the truck in the alley. Candido testified that he saw a police car parked in front of the house and police officers talking to neighbors, so they parked the Denali behind the gangway of the neighbor's house to see what was happening. Once they were parked, Candido talked with Luis outside the truck, while Juan remained in the driver's seat of the

truck. Candido heard a "popping" sound and felt a sting on his hand. Candido ran to the gangway of Juan's mother's house, but after finding it locked, Candido ran through the garage then up the stairs into the residence. Candido then noticed that he had been shot in both of his legs, behind his knees.

Several days later, on September 17, 2004, police officers visited Candido at his home and showed him a photographic array. Candido identified defendant as the individual whom he saw on the street showing his gun. On September 24, 2004, Candido was driving with Luis and Juan in Juan's truck. They were driving to the police station to view a lineup when Luis called the police after seeing codefendant Arnold near the stop sign of Rosemont and Western Avenues. They flagged down a police car and Arnold was taken into custody. At the police station, Candido identified defendant in the lineup.

Luis Villalobos testified to a similar version of events. Luis testified that when the group surrounded Juan's truck at the stop sign, he argued with codefendant Arnold, who said he was a Latin King gang member and flashed a tattoo on the left side of his neck. Luis testified that he was not a gang member and he told codefendant that he did not "want no problems with anybody." Luis gave codefendant the middle finger and told him to "go f --- himself." Luis also saw defendant standing on the right side of the truck, flashing a gun by pulling it out of his pocket. Luis told Juan that they should leave and Juan drove around the block of their parent's home because they saw a police car parked in front. Juan parked in the alley behind their parent's house. Luis and Candido got out of the truck and were talking when Luis heard "pops" from behind him and felt a sting in his buttocks. Luis turned around and saw codefendant shooting a

gun with one arm over the fence gate of a gangway. Luis ran through his parents' garage and went upstairs to his brother's apartment, where he called the police. Luis testified that the shooting occurred at about 10 p.m. and there was a bright alley light on next to Juan on the driver's side of the truck.

On September 17, 2004, Luis spoke with police officers at his parents' home and viewed a photographic array. Luis identified defendant as the individual who flashed the gun at the stop sign at Rosemont and Fairfield Avenues. Luis testified that he did not identify codefendant in the photographic array because codefendant's photo looked different than his appearance on the day of the shooting. Luis testified that on September 24, 2004, he drove with Juan and Candido to the police station to view a lineup. On the way to the police station, Luis saw an individual near Rosemont and Western Avenues and told his brother, "Look at the guy over there. That's the guy right there that shot us." Luis identified codefendant as that person in court. Luis testified that they flagged down a police officer then proceeded to the police station. Luis testified that he viewed a lineup and identified defendant as the individual who flashed the gun at the stop sign. Luis viewed a second lineup, in which he identified codefendant as the individual who shot him in the alley.

Juan Villalobos testified to the same version of events. Juan testified that when he stopped at the corner, he saw defendant from about 10 feet away pull a gun more than halfway out of his pants. Juan also heard codefendant yell, "LK, King Love, what you guys be about" and saw codefendant pull down the collar on the left side of his shirt to show a tattoo. Juan testified that he was not in a gang and that his brother cursed at codefendant. Juan then drove to the alley

behind his parents' house and parked his Denali in the alley. Juan remained in the driver's seat of the truck with the windows down and was talking to Luis and Candido, who were standing outside the truck. Juan then heard loud noises and saw Luis and Candido run. Juan saw codefendant shooting a gun over the fence of a gangway. Juan testified that he saw defendant standing behind codefendant near the back corner of the garage. Juan testified that defendant pointed a gun in the direction of the truck, but Juan never saw him fire the gun. Juan testified that he could see defendant because codefendant ran by defendant and activated sensor lights. Juan also testified that there were alley lights on. Juan testified that defendant also fled, "like walking running [at] the same time." Juan testified that as defendant started to leave, he continued to point the gun in Juan's direction. Juan testified that he observed defendant from about 20 feet away. After defendant and codefendant fled, Juan exited his truck and noticed blood when he ran into the garage. Juan testified that he was nervous during the incident and did not know what happened to Luis and Candido. When he returned to his truck later, he observed that there were bullet holes in it. Juan denied telling police officers at the scene that the offenders had chased him down a gangway prior to shooting at him.

Juan testified that on September 24, 2004, he drove with Luis and Candido to the police station to view a lineup. While driving to the police station, Luis saw codefendant walking and notified a police officer. At the police station, Juan identified defendant in a lineup as the second individual who was holding a gun at the time of the shooting. Juan testified that he told the police that defendant was "the guy that was at the scene holding the second gun that was pointing towards me." Defendant also stated to police, "That's the other guy that I seen perfectly."

During a second lineup, Juan identified codefendant as the individual that shot at him. Juan acknowledged that he was on probation for a felony conviction for possession of a handgun.

Chicago police officer Michael Seiser testified that he and his partner were the second police car to arrive at the scene of the shooting, at about 10 p.m. Officer Seiser testified that a woman at the scene provided a description of the possible shooters and informed him that two Assyrian or Hispanic men had fled southbound on Rockwell Street in a small gold car, possibly a Toyota. Juan informed Officer Seiser that two offenders pulled up on the scene in a small gold car, ran out, chased him through a gangway at 6331 Rockwell Street, and fired shots at the victims. Officer Seiser also testified that the alley was well-lit and there was a light pole near the garage where the truck was parked.

Chicago police officer Daniel Smith testified that a few days after the shooting, he compiled a photographic array. On September 17, 2004, Candido viewed the photographs and identified defendant as one of the individuals involved in the shooting. Officer Smith showed the same photographic array to Luis and Luis identified defendant as the individual he saw flashing a gun prior to the shooting.

Detective Michael Horne testified that he conducted the lineups at the police station on September 24, 2004. Detective Horne testified that Candido, Luis, and Juan all identified defendant in the lineup. Detective Horne testified that Luis and Juan viewed a second lineup and identified codefendant. Detective Horne testified that Candido did not view the lineup in which codefendant participated because Candido stated that he did not see the shooter.

The parties stipulated that if called to testify, forensic scientist Kurt Murray would testify

that he analyzed the seven shell casings that were recovered from the scene. The parties further stipulated that Murray would testify that six of the casings were determined to have been fired from the same firearm and the seventh casing could not be identified or eliminated as having been fired from the same firearm.

Defendant made a motion for a directed verdict, which the circuit court granted as to the first three counts of attempted murder, finding that the State did not prove beyond a reasonable doubt that defendant had the specific intent to kill. The circuit court denied defendant's motion as to counts IV through VI, charging defendant with aggravated battery with a firearm and aggravated discharge of a firearm.

Defendant called three alibi witnesses to testify on his behalf. Nanvah Michael testified that she is defendant's sister and resides in Australia. Nanvah testified that on September 14, 2004, she, her husband, and her daughter were visiting her parents in Skokie, Illinois. Nanvah testified that on that date she had dinner at her parents home at about 6 or 7 p.m. with her husband, her sister Linda Jovanovic, Linda's husband, and defendant. Nanvah's friend, Rita Mikhail, came over to visit after dinner. Nanvah testified that she remembered having dinner together on September 14 because the next day was her mother's birthday and the group was discussing purchasing a gift. Nanvah testified that the group sat outside after dinner and the only time defendant was not with them was when he went inside to use the restroom. Nanvah testified that defendant asked Linda if he could use her grey Honda Civic to visit his girlfriend, but Linda would not let him borrow the car. Rita offered to drive defendant to his girlfriend's house, but defendant refused the ride. Nanvah testified that she spoke with detectives on September 25,

2004, but denied telling detectives that defendant left the house between 7 and 10 p.m. Nanvah also testified that she was unsure whether defendant was in a gang, but defendant has "Thug Life" and "Chicago's Finest" tattoos on his arms.

Linda Jovanic testified that she is defendant's sister and that on the night in question she was at her parents' home for dinner at 6 p.m., with her husband, Nanvah, Nanvah's husband, and defendant. Linda testified that Nanvah's friend Rita visited them after dinner and the group was in the backyard at 10 p.m. Linda testified that she did not recall defendant leaving the backyard anytime during that evening. Linda testified that she did not know if defendant belonged to a gang, but he had a "Thug Life" tattoo on his arm.

Rita Mikhail testified that she is Nanvah's friend and arrived at Nanvah's parents house at about 7 p.m. on the night in question. Rita testified that she visited until midnight and that she did not recall defendant being absent for any period of time while she was there.

In rebuttal, Officer Harry Fenner testified that he spoke with Nanvah on the phone following defendant's arrest. Officer Fenner testified that Nanvah told him that on the date in question, defendant had gone to traffic court in the morning, slept most of the day, ate dinner with the family, then left the house from about 7 p.m. until 10 or 10:30 p.m. Officer Fenner testified that he did not document his conversation with Nanvah. State's Attorney Investigator Gus Martinez also testified in rebuttal that he interviewed Rita and that she stated she could not remember the date of the incident.

Based on this evidence, the circuit court found defendant guilty of aggravated battery with a firearm. Defendant filed a motion for a new trial arguing that the identification testimony was

unreliable and that defendant presented credible alibi witnesses. The circuit court denied defendant's motion.

Defendant filed a motion to reconsider the denial of his posttrial motion. Codefendant Arnold provided an affidavit in support of defendant's motion, in which codefendant stated that he was the one who shot at the victims and that Carlos Kilyan or "C-Bone" served as his "security." Codefendant also attested that his statement was the result of a visit from a private detective on July 10, 2006, and that codefendant would be willing to testify regarding his statement. The circuit court granted defendant's request for an evidentiary hearing on his posttrial motion to reconsider.

At the evidentiary hearing, codefendant Arnold was admonished by the circuit court regarding his right not to testify and that his testimony could be used against him in his current appeal from the guilty verdict involving the same incident. Codefendant Arnold had been convicted of attempted murder and sentenced to 15 years in prison, some 9 months prior to providing the affidavit to the private detective. Arnold indicated that he understood and wished to testify. Arnold testified that he was the shooter and that an individual named Carlos Kilyan, or "C-bone," stood behind him and served as his lookout. Arnold testified that defendant was not present at the shooting. Arnold testified that on the date in question, he spoke with defendant on the phone and defendant told him he was staying home with his family, including his sister who was visiting from Australia. Arnold testified that defendant and Carlos looked very similar and had identical tattoos.

Arnold explained that on the evening in question, he was "gang banging" at the

intersection of Rosemont and Fairfield Avenues. A black Denali truck approached the intersection and Arnold yelled "Latin King Love" to the three men in the truck and they yelled the same thing back, indicating that they claimed to be members of the same gang. Arnold then argued with the three men in the truck because he did not recognize them. Arnold knew that Carlos had a gun and he motioned for Carlos to shoot the occupants of the truck, but Carlos did not shoot them. After the truck drove away, Arnold yelled at Carlos for not "tak[ing] care of them."

Arnold testified that he, Carlos, and two other gang members then drove around in a champagne-colored Honda looking for the Denali truck. Arnold saw the truck parked in an alley, took the gun from Carlos, and he and Carlos ran through a gangway to get closer to the truck. Arnold saw two of the men from earlier standing outside the truck, and the third man was still in the driver's seat of the truck. Arnold testified that he could not get through the gate at the end of the gangway, so he placed his hand over the chain-link fence and started shooting at the three men. After firing seven to nine times, Arnold and Carlos ran out of the gangway, got into the Honda and left the area.

On cross-examination, Arnold admitted that when he was arrested he lied to the assistant State's Attorney about his whereabouts on the night in question. Arnold was also aware early in the proceedings that defendant had been charged with him in the shooting, but he did not say anything. Arnold testified that a private investigator working for defendant's family visited him in prison and Arnold provided him with a written statement. Arnold acknowledged receiving deposits in his commissary fund from defendant's family, totaling about $600, prior to providing

the written statement. Arnold testified that the money was "no where near the amount of money that [he] would have if somebody paid [him] to come [to court] and lie on the stand for another man."

Arnold also provided the following testimony during cross-examination:

"Q. By the way, Mr. Castillo, *** when you gave this statement to [the private investigator], isn't it true that People's Exhibit Number Two is silent with respect to [defendant's] whereabouts on the night of the shooting, isn't it?

A. Excuse me?

Q. You don't say in there where you thought he was that night, do you?

A. Yeah, he was, my security for my back.

Q. No, no, that's C-Bone, that's Carlos Kilyan. I'm talking about [defendant] the guy I'm pointing at right now?

A. He wasn't with me.

Q. The statement doesn't say that, does it?

A. No."

Following the hearing, the circuit court denied defendant's motion to reconsider. After a sentencing hearing, defendant was sentenced to seven years in prison. Defendant appealed and the Office of the State Appellate Defender was appointed to represent him. While defendant's appeal was pending before this court, defendant retained private counsel and this court granted counsel's request to file supplemental briefs in this case.

ANALYSIS

I. Sufficiency of the Evidence

On appeal, defendant first contends that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm where the evidence against him consisted only of a single identification witness who had a limited opportunity to view the offender who accompanied the shooter.

When reviewing the sufficiency of the evidence, it is necessary to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) People v. Magee, 374 Ill. App. 3d 1024, 1031 (2007), quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is not the function of the reviewing court to retry the defendant or substitute its judgment for that of the trier of fact. People v. Evans, 209 Ill. 2d 194, 209 (2004). Rather, the trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony, and resolves conflicts or inconsistencies in the evidence. Evans, 209 Ill. 2d at 211. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. People v. Wesley, 382 Ill. App. 3d 588, 590 (2008).

Contrary to defendant's assertion, the evidence in this case was not so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt where an eyewitness positively identified defendant as the second individual who held a gun and accompanied the shooter. Identification by a single witness is sufficient to support a conviction if the defendant is viewed

under circumstances permitting a positive identification. People v. Rincon, 387 Ill. App. 3d 708, 723 (2008). The factors to be considered in evaluating the reliability of identification testimony are: (1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of the offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. Rincon, 387 Ill. App. 3d at 723.

Here, a review of the record demonstrates that Juan provided a reliable pretrial identification of defendant as the second offender at the scene of the shooting. Ten days after the shooting, on September 24, 2004, Juan viewed a lineup at the police station and identified defendant as the second individual who was holding a gun at the time of the shooting. Juan demonstrated a high level of certainty at the identification by telling police that defendant was "the guy that was at the scene holding the second gun that was pointing towards me" and "the other guy that I seen perfectly." Juan again identified defendant at trial. In addition, Juan testified that he was 20 feet away when he observed defendant and Juan looked at defendant as defendant pointed the gun in his direction. Juan had a high degree of attention where he had just witnessed his brother and friend being shot at and was concerned for their safety. Juan also testified that there was a light in the alley and that the gangway where the offenders were standing was lit by a motion sensor light. Officer Seiser corroborated Juan's testimony that the alley was well lit with artificial lighting. Further, Candido and Luis corroborated Juan's testimony that defendant was the individual that had been with codefendant at the intersection of Rosemont and Fairfield Avenues shortly before the shooting occurred. Both Candido and Luis identified defendant in a

photographic array and in a physical lineup at the police station as the individual who had flashed a gun at that intersection. Defendant maintains that Juan mistakenly identified defendant instead of Carlos as the second offender because they look identical. However, the record shows that photographs of both defendant and Carlos were included in the photographic array from which defendant was identified and Carlos was excluded.

Defendant asserts that Juan's identification of defendant as the second offender at the shooting was undermined by the three reliable alibi witnesses. Defendant maintains that Nanvah, Linda, and Rita all presented credible testimony that defendant was at his family's home the entire evening of September 14, 2004. However, the trial court is not obligated to believe a defendant's alibi witnesses over the State's witness, especially where the defendant's witnesses are related to the defendant and failed to come forward during the initial investigation. Rincon, 387 Ill. App. 2d at 723 (2009), citing People v. Mullen, 313 Ill. App. 3d 718, 729 (2000). This court will not disturb the circuit court's findings regarding credibility, because a rational trier of fact could have found that Juan presented credible testimony, while the defense witnesses did not.

Defendant also argues that Juan's identification testimony was contradicted by codefendant Arnold's testimony during the posttrial motion that he was the shooter and that defendant was not with him at the time of the shooting. Defendant relies on Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), to argue that the fact that Arnold provided this testimony against his penal interest provides considerable assurance of his testimony's reliability. We find defendant's reliance on Chambers unconvincing.

In Chambers, another individual, McDonald, who was not charged with the offense, had

signed a sworn confession to having committed the murder and made unsworn statements to others in which he admitted committing the murder. The defendant was permitted to call McDonald as a witness and to introduce the sworn, written confession but, at trial, McDonald denied committing the murder and recanted the confession. Under Mississippi's "voucher" rule of evidence, the defendant was prohibited from thereafter impeaching McDonald either by cross-examination or by use of his prior unsworn statements. Mississippi's hearsay rule did not permit McDonald's prior inconsistent, but unsworn, statements to be used for substantive purposes and did not contain an exception for hearsay statements against penal interest. The United States Supreme Court held that the testimony rejected by the trial court "bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest." Chambers, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049. The Court noted that the recanted confession "was in a very real sense self-incriminatory and unquestionably against interest." Chambers, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048. The Court explained that McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. In addition, McDonald was present in the courtroom, was under oath, and could have been cross-examined by the State about his prior statements. The Court held that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice" and concluded that the exclusion of this evidence denied the defendant a fair trial. Chambers, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.

Here, unlike <u>Chambers</u>, this court is not presented with the issue of whether evidence was properly excluded under the hearsay rule. Rather, defendant was permitted to introduce Arnold's testimony at the hearing on defendant's posttrial motion and Arnold provided testimony implicating himself in the shooting. While defendant maintains that Arnold's testimony was trustworthy because it was against his best interest, the State presented evidence that Arnold received monetary contributions from defendant's family prior to providing the written statement implicating himself in the shooting. In addition, Arnold did not face the potential for further criminal prosecution based on his statements, where he had already been convicted and was serving his sentence for his role in the shooting. Arnold also admitted that he previously lied to an assistant State's Attorney about his involvement in the shooting. Further, Arnold testified that the second individual was with him as "security for his back" and that his statement to the private investigator did not mention defendant's whereabouts at the time of the shooting. The circuit court weighed the testimony of the witnesses in this case and determined that the State's witnesses were credible, whereas Arnold's testimony that defendant was not the individual who was with him on the corner then accompanied him as backup at the shooting was incredible. We therefore will not disturb the trial court's credibility determination where a rational trier of fact could have deemed Arnold's testimony incredible.

Defendant next argues that this court should reverse the circuit court's finding of guilt where it was based on the circuit court's incorrect recollection of the evidence. In finding defendant guilty, the court explained:

> "The issue then did come down to one of identification. He was identified by two

people in this case as the person that was in the gangway with a gun and had been seen earlier at the time where the original incident started."

Defendant then asked, "Judge was it your recollection that two witnesses identified him in the gangway?" The court responded:

"He was identified as being on the scene originally with a gun, and then he was identified in the gangway by one witness shooting the gun, as I recall. Identification by one of the brothers and by Candido ***. He was picked out by two people in this case, the way I recalled it."

While the judge was initially unclear when he indicated that two people identified defendant as the individual in the gangway, the record shows that the judge immediately corrected himself. The judge explained that he recalled that one witness (it was actually two) identified defendant as the individual who was at the initial incident with a gun, and another witness identified defendant as the individual who was in the gangway during the shooting. We find defendant's argument in this respect unavailing.

Defendant further argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery with a firearm based on accountability because the State failed to show that defendant aided or abetted codefendant or had the specific intent to facilitate the crime.

A defendant is accountable for the conduct of a codefendant when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2004). Mere presence at the scene of the crime with

knowledge of its commission alone does not establish accountability, but active participation is not required to render a defendant accountable for the acts of another. People v. Turner, 375 Ill. App. 3d 1101, 1104 (2007). A defendant need not act affirmatively if there is a "common criminal plan or purpose." People v. Taylor, 164 Ill. 2d 131, 140-41 (1995). A common criminal plan or design can be inferred from the circumstances, and a defendant need not express "[w]ords of agreement" to be held accountable for a codefendant's criminal acts. Taylor, 164 Ill. 2d at 141. In Taylor, our supreme court identified several circumstances that may be considered by the trier of fact in determining defendant's legal accountability, including: (1) presence at the scene without disapproval; (2) flight from the scene; (3) failure to report the crime; (4) close affiliation with the codefendant afterward; (5) sharing the proceeds of the criminal act; and (6) destroying or disposing of evidence. Taylor, 164 Ill. 2d at 141.

Defendant relies on People v. Perez, 189 Ill. 2d 254 (2000), People v. Ceasar, 231 Ill. App. 3d 54 (1992), and People v. Trapps, 22 Ill. App. 3d 1029 (1974), to support his argument that the evidence was insufficient to support his conviction. Unlike Perez, Ceasar, and Trapps, the evidence in this case showed that defendant was present with codefendant prior to the shooting where defendant displayed a gun, defendant then accompanied codefendant to the scene, defendant pointed a gun in the victims' direction while codefendant fired his gun, and defendant then fled the scene with codefendant. Here, it was reasonable to infer that defendant not only had knowledge of the criminal purpose, but affirmatively acted to support that purpose by accompanying codefendant and pointing a gun at the victims during the crime. See Perez, 189 Ill. 2d at 268 (finding no shared criminal purpose because defendant did not appear at the scene with

the codefendants, joined the codefendants to pay an unrelated monetary debt, and lacked knowledge of the crime); Ceasar, 231 Ill. App. 3d at 56 (finding that defendant's appearance and flight with the codefendant after the commission of the crime was insufficient to hold him accountable); Trapps, 22 Ill. App. 3d at 1032-33 (holding that defendant's presence at the scene of the crime without any evidence that she knew of codefendant's actions, fled with or continued to associate with codefendant did not support a finding of a common criminal design). In addition, Arnold testified that the individual that accompanied him was serving as "security for my back" during the shooting.

We conclude that the evidence, taken in the light most favorable to the prosecution, established beyond a reasonable doubt that defendant's presence with defendant prior to and at the scene, support during the crime, flight with the codefendant, and failure to report the crime were sufficient to support an inference of a shared criminal design and, therefore, was sufficient to support defendant's conviction.

II. Claims of Ineffective Assistance of Trial Counsel

Defendant next contends that trial counsel was ineffective by failing to: (1) file a motion for severance of trial from that of codefendant; (2) file a motion to suppress the identification testimony; and (3) investigate and impeach Juan with evidence regarding his felony conviction.

In determining whether a defendant was denied the effective assistance of counsel, this court applies the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by our supreme court in People v. Albanese, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant

must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. The failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

### A. Motion to Sever Trial

Defendant first contends that trial counsel was ineffective for failing to file a motion to sever his trial from that of codefendant. The long-established rule in this jurisdiction is that defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice. People v. Lee, 87 Ill. 2d 182, 187 (1981); People v. Byron, 116 Ill. 2d 81, 92 (1987). Our supreme court has recognized that at least two types of prejudice can be readily identified. Lee, 87 Ill. 2d at 187. First, a defendant may be denied his constitutional right of confrontation if, in a joint trial, the State introduces the admission of a codefendant which implicates the defendant. People v. Bean, 109 Ill. 2d 80, 93 (1985); Lee, 87 Ill. 2d at 187. The second is when the codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others. People v. Daugherty, 102 Ill. 2d 533, 542 (1984).

Here, defendant argues that the second variety of prejudice, antagonistic defenses, was

involved in this case. Severance is required when the defenses are so antagonistic that a severance is imperative to ensure a fair trial. <u>Byron</u>, 116 Ill. 2d at 92. Actual hostility between the two defenses is required. <u>Bean</u>, 109 Ill. 2d at 93. This is generally the situation in which one defendant points a finger at the other as the real perpetrator of the offense (<u>Lee</u>, 87 Ill. 2d at 187), or where each defendant is protesting his innocence in condemning the other (<u>Daugherty</u>, 102 Ill. 2d at 542).

We find that defendant's reliance on <u>Byron</u>, to support his argument that he and codefendant had antagonistic defenses, is misplaced. In <u>Byron</u>, the defendant argued that the codefendant was the murderer and that defendant was not even there. <u>Byron</u>, 116 Ill. 2d at 92. Our supreme court explained, "The trial became more of a contest between the two defendants than between the People and each defendant; the record is replete with instances in which defense counsel attacked each other's clients, as well as each other, and only a severance could have provided defendant a fair trial." <u>Byron</u>, 116 Ill. 2d at 93. Here, defendant's alibi defense was that he was home with his family and did not implicate codefendant. There is nothing in the record to indicate that the attorneys for defendant and codefendant attacked each other's clients or to indicate that severance was required to ensure defendant a fair trial.

Defendant also argues that the fact that codefendant had a jury trial and defendant elected a bench trial created the likelihood that the court "may forget or misapply the evidence months later when it makes a ruling in the bench trial." However, defendant's argument is speculative and there is nothing in the record to support this contention. In fact, the circuit court explained its determination and noted that after the jury found codefendant guilty, "[t]he case was severed

-21-

1-07-2231

and the court separately considered the evidence against [defendant]."

We conclude that because defendant has failed to establish that he was entitled to severance, defendant can not show that trial counsel was deficient in failing to file a motion to sever his trial.

### B. Identification Testimony

Defendant next contends that trial counsel was ineffective by failing to file a motion to suppress the eyewitnesses' identification of defendant where such identification was the product of a suggestive police lineup and photographic array, and where Juan's identification of defendant was unreliable.

To prevail on an ineffectiveness claim for failure to file a motion to suppress, defendant bears the burden of showing that the motion would have been granted and that the trial outcome would have been different if the evidence had been suppressed. People v. Love, 377 Ill. App. 3d 306, 310 (2007). Providing effective legal assistance does not require defense counsel to make losing arguments. Love, 377 Ill. App. 3d at 311

Here, defendant first argues that trial counsel should have moved to suppress the lineup because it was unduly suggestive where the men surrounding defendant had darker skin and wore darker shirts while defendant wore a white T-shirt, where the men in the lineup were all seated so that the witnesses could not focus on height, and where only defendant and the man next to him had distinguishable facial hair. Defendant also argues that trial counsel should have moved to suppress the photo array because none of the men looked similar to defendant.

In a motion to suppress identification testimony, the defendant bears the burden of

proving a pretrial identification was impermissibly suggestive. Love, 377 Ill. App. 3d at 311. " 'Only where a pretrial encounter resulting in an identification is 'unnecessarily suggestive' or 'impermissibly suggestive' so as to produce 'a very substantial likelihood of irreparable misidentification' is evidence of that and any subsequent identification excluded by law under the due process clause of the fourteenth amendment.' " Love, 377 Ill. App. 3d at 311, quoting People v. Moore, 266 Ill. App. 3d 791, 796-97 (1994).

The law does not require that lineups and photographic arrays shown to a witness include near identical or look alikes of the witness's descriptions. The court must look to the totality of the circumstances surrounding the identification to determine whether due process is violated. People v. Johnson, 149 Ill. 2d 118, 147 (1992). The photograph of the police lineup shows that it included four other men of the same approximate age and skin tone. The men were all seated with their arms on their laps. Defendant wore a white T-shirt and was seated between two men who wore identical blue logo polo shirts. The other two men wore a red T-shirt and a white tank top, respectively. While the men had on different colored shirts or had lighter facial hair, these factors are relevant only within the context of the totality of circumstances. The participants in the lineup shared many similar features. However, participants in a lineup are not required to be physically identical. Love, 377 Ill. App. 3d at 311.

In United States v. Wade, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967), the United States Supreme Court addressed the issue of unnecessarily suggestive lineup procedures. Situations in which an accused is prejudiced by the lineup procedures may include:

"[T]hat all in the lineup but the suspect were known to the identifying witness, that

the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, that the witness is told by the police that they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect." Wade, 388 U.S. at 233, 18 L. Ed. 2d at 1160-61, 87 S. Ct. at 1935-36.

"The theme running through all these examples is the strength of suggestion made to the witness. Through some specific activity on the part of the police, the witness is shown an individual who is more or less spotlighted by the authorities." Johnson, 149 Ill. 2d at 147. As defendant points out, while he was the only one wearing a white T-shirt, there is no indication that this was by design. We see no improper influence here where the defendant simply wore his own clothing in the lineup.

In addition, the photographic array included five photographs of other men of the same approximate age, skin tone, and short dark hair. There is nothing to indicate that a suggestion was made to the witnesses in identifying defendant either in the photographic array or the police lineup. Accordingly, we find there was no evidence that any police misconduct caused the identifications or that a motion to suppress the identification would have been successful in this case. Further, as previously discussed, Juan's identification was sufficient to support defendant's conviction and, therefore, does not support a claim of ineffective assistance of trial counsel in this regard. Therefore, trial counsel's decision not to file such a motion was a matter of professional

judgment and does not support defendant's claim of ineffective assistance of counsel.

C. Investigation and Impeachment of the States' Witnesses

Defendant also contends that trial counsel was ineffective by failing to investigate and impeach Juan with evidence of his felony conviction and status of his probationary sentence. Defendant argues that Juan "could have received favorable treatment from the State for his testimony if his probationary status was in jeopardy" or "could have personally felt pressure to testify favorabl[y] for the State."

We find defendant's argument to be entirely speculative. Further, the record shows that Juan testified that he was convicted of felony possession of a handgun and was on probation at the time of his testimony. The trier of fact was therefore aware of Juan's status at the time of his testimony and defendant has not established prejudice to support his claim of ineffective assistance of trial counsel. See Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069 (the failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel).

Defendant further argues that trial counsel should have called an officer to offer impeachment testimony against Detective Fenner where Detective Fenner's testimony about his phone conversation with Nanvah was not memorialized in a "General Progress Report" (GPR). However, Detective Fenner's conversation with Nanvah related to defendant's whereabouts on the evening in question. Trial counsel presented three alibi witnesses, including Nanvah, to testify regarding defendant's whereabouts. We find that trial counsel's decision regarding which witnesses to present was within the realm of trial strategy and does not support defendant's claim

of ineffective assistance where defendant's bench trial was presided over by a highly experienced circuit court judge who had to be familiar with GPRs. See People v. Johnson, 385 Ill. App. 3d 585, 601 (2008) (a decision whether or not to call a particular witness about a particular subject is a matter of trial strategy, left to the discretion of trial counsel).

### III. Motion for a New Trial

Defendant lastly contends that the circuit court erred in denying his motion for a new trial based on newly discovered evidence.

Defendant argues that the circuit court's ruling infringed upon his constitutional rights such that a *de novo* standard of review should apply in this case. However, the denial of a motion for a new trial based on newly discovered evidence will not be disturbed on appeal absent an abuse of discretion. People v. Kolb, 273 Ill. App. 3d 485, 489 (1995). In Illinois, newly discovered evidence warrants a new trial when: (1) it has been discovered since the trial; (2) it is of such a character that it could not have been discovered prior to the trial by the exercise of due diligence; (3) it is material to the issue and not merely cumulative; and (4) it is of such a conclusive character that it will probably change the result on retrial. People v. Williams, 295 Ill. App. 3d 456, 462 (1998).

Defendant argued before this court that Arnold's posttrial testimony exculpates defendant and inculpates another individual. The State concedes that Arnold's testimony was "newly discovered" because it could not have been discovered with the exercise of due diligence where Arnold was a codefendant at trial and defendant could not have forced Arnold to violate his fifth amendment right to avoid self-incrimination. See People v. Molstad, 101 Ill. 2d 128, 135 (1984)

("no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination"). However, the State argues that Arnold's testimony was cumulative and was not of such a conclusive character that it would probably change the result on retrial.

In addition to being newly discovered, the new evidence must be material and not merely cumulative of other trial evidence. Evidence is considered cumulative when it adds nothing to what was already before the jury. People v. Ortiz, 235 Ill. 2d 319 (2009). At the posttrial hearing, Arnold testified that defendant was not with him at the time of the shooting, but, rather, defendant was at home visiting with his family members. Arnold then provided an account of the shooting, in which he stated that Carlos accompanied him and served as "backup" at the shooting. Arnold provided a first-person account of the shooting that contradicted the testimony of the State's witnesses that defendant was the second offender present at the corner and also at the scene of the shooting a short time later. This testimony was not merely cumulative to defendant's alibi witnesses who testified that defendant was home with his family at the time of the shooting. Rather, Arnold's testimony would add to what was before the trial court during the bench trial.

However, we cannot say that the circuit court abused its discretion in denying defendant's motion for a new trial where Arnold's testimony was not of such a conclusive character that it would have changed the result on retrial. Arnold was cross-examined regarding the fact that he received money from defendant's family prior to providing a written statement and testimony in this case and Arnold admitted being untruthful to the assistant State's Attorney. Arnold also indicated that his affidavit did not state that defendant was not with him at the time of the

shooting. Further, Arnold's testimony strongly corroborated the State's witnesses' testimony in all respects other than the identification of his "backup."

Defendant relies on Molstad and Ortiz in support of his argument that he was entitled to a new trial based on the newly discovered evidence of Arnold's testimony. In Molstad, our supreme court granted a new trial based on newly discovered evidence consisting of affidavits executed by the codefendants of the defendant. In that case, following a guilty verdict but prior to the sentencing of four convicted defendants, defense counsel offered affidavits of four convicted codefendants and one acquitted codefendant that stated that the defendant had not been present at the scene of the crime. Our supreme court concluded that those affidavits would create new issues to be considered by the trier of fact. Molstad, 101 Ill. 2d at 135. The court held that the new affidavits could not have been discovered with the exercise of due diligence, since the codefendants could not have been forced to violate their fifth amendment right to avoid self-incrimination if the codefendants did not choose to do so. Molstad, 101 Ill. 2d at 135. The court reasoned that the evidence in that case likely would have produced a different result because the testimony of the sole prosecution witness placing the defendant at the scene of the crime would have to have been weighed against the defendant's own alibi testimony as well as the testimony of the five codefendants. Molstad, 101 Ill. 2d at 135-36.

In Ortiz, our supreme court granted the defendant a new trial based on the testimony of a newly discovered additional eyewitness. The court held that the testimony was newly discovered where the witness did not admit to having witnessed the incident until more than 10 years after trial and made himself unavailable as a witness when he moved to a neighboring state shortly after

the murder. Ortiz, 235 Ill. 2d at 325. Our supreme court noted that the "sole basis" of the circuit court's decision denying the defendant's third postconviction petition alleging actual innocence was that the new eyewitness' testimony was cumulative of other evidence presented at the defendant's jury trial. Ortiz, 235 Ill. 2d at 325-26. Our supreme court held that this finding was manifestly erroneous where the new testimony conflicted with the State's main witnesses on the central issue of who beat and killed the victim. Ortiz, 235 Ill. 2d at 326. The court further held that the newly discovered additional eyewitness testimony was of such a conclusive character that it would probably change the result of a retrial where the testimony directly contradicted the recanted testimony of the two prosecution witnesses and the State was unable to discredit the additional eyewitnesses' testimony that he witnessed both the beating and the shooting and that the defendant was not present during either event. Ortiz, 235 Ill. 2d at 326.

We believe that Molstad and Ortiz are distinguishable from the instant case. In those cases, the circuit court did not assess the credibility of the testimony provided by the new witnesses. In Molstad and Ortiz, the State did not discredit the newly discovered evidence provided by the codefendants and the eyewitness, respectively. However, here, the circuit court considered Arnold's impeached testimony and determined that a new trial based on the newly discovered evidence was not warranted. Further, both defendants in Molstad and Ortiz were tried before juries. In the instant case, the judge who considered the newly offered evidence was the trier of fact. Indeed, the circuit court had granted defendant's request for an evidentiary hearing before ruling on the motion for reconsideration.

Defendant also argues that, during the hearing on defendant's motion for a new trial, the

circuit court improperly asked how defendant's photograph ended up in the photographic array and the court was misinformed about who officially recorded any information about the conversation between Detective Fenner and Nanvah and how it was done. Defendant did not raise any objection to these alleged errors or include them in any of his posttrial motions. Defendant therefore waived these claims of error on appeal. People v. Enoch, 122 Ill. 2d 176, 186 (1988).

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." People v. Piatkowski, 225 Ill. 2d 551, 565 (2007). However, in order to find plain error, this court must first find that the trial court committed some error. People v. Rodriguez, 387 Ill. App. 3d 812, 821 (2008).

In this case, the record shows that the circuit court asked how defendant's photograph ended up in the photo array and the State responded that detectives "compiled pictures of known gang members from the area and [defendant's] picture happened to be one of them." The record also shows that the circuit court then remarked that defendant's "photo came out" and "he was identified as having a gun." Defense counsel responded that defendant "was identified as somebody who was out at Rosemont and the other cross street, not as being someone who was involved in a shooting 15 minutes later eight blocks away in a gangway." The circuit court

responded, "And if he was on the corner at all, then that alibi isn't right, could it be?"

The circuit court also asked the parties to clarify for the record whether there was some memorialization of the conversation between Detective Fenner and Nanvah and the parties acknowledged that a GPR was created in this case. However, the parties disagreed about whether the information in the GPR was consistent with Detective Fenner's testimony.

In denying defendant's posttrial motion, the court then stated that it heard the evidence at trial, carefully considered defendant's posttrial motions, reread transcripts, and listed to Arnold's testimony. We cannot say that the circuit court's questions seeking clarification of the testimony at trial were erroneous and we, therefore, decline to review defendant's argument under the plain-error doctrine.

CONCLUSION

For the above reasons, we affirm the circuit court's judgment.

Affirmed.

STEELE and COLEMAN, JJ., concur.