2021 IL App (1st) 171119-U

FIRST DIVISION
June 28, 2021

No. 1-17-1119

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 12 CR 564 |
| | ) | |
| DEMONTE WILLIAMS, | ) ) | Honorable Tommy Brewer, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
PRESIDING JUSTICE WALKER and JUSTICE HYMAN concurred in the judgment.

## ORDER

¶ 1    *Held*:    The trial court did not err in denying defendant's motion to suppress.

¶ 2    Following a jury trial, defendant, Demonte Williams, was convicted of two counts of aggravated battery and four counts of attempt armed robbery.  He was sentenced to two concurrent terms of twelve years' imprisonment.   On appeal, defendant argues that the trial court erred in denying his motion to suppress identification.  For the foregoing reasons, we affirm the judgment of the trial court.

¶ 3                                    BACKGROUND

¶ 4     On October 8, 2011, shortly before 11p.m., Cecil Sr., Cecil Sr.'s sister, Janeka, his son, Cecil Jr., and his brother, Justin were walking to Cecil Sr.'s mother's home at 14502 South Wabash Avenue in Riverdale, Illinois. At about 145th Street and Wabash Avenue, they encountered three individuals on the street, one of which was defendant. Two of the individuals stood at a distance in the middle of the street. Defendant approached Cecil Sr. and his family and demanded unspecified property from them.

¶ 5     Cecil Sr. told defendant they had nothing to give him, and after looking at defendant for "a good few seconds," Cecil Sr. turned away to continue walking to his mother's home. Justin also turned away to continue toward the house. As both Cecil Sr. and Justin walked away, Janeka saw defendant remove a gun from his pocket and shoot the gun in Justin's direction. Cecil Sr., Justin, Cecil Jr., and Janeka ran, and defendant continued shooting at them. Defendant struck both Cecil Sr. and Justin in the back.

¶ 6     Halayna Arnold Hubbard, the sister of Cecil Sr., Justin, and Janeka, was inside their mother's home at the time of the shooting and ran outside after learning from Janeka that Justin had been shot. Janeka followed Halayna outside and they saw defendant run past them. Halayna made eye contact with defendant, shouted at defendant, and chased defendant to an alley until she lost sight of him.

¶ 7     The Riverdale Police responded to 14502 South Wabash Avenue after the shooting. Cecil Sr. and Justin were transported to Christ Hospital for treatment of their injuries.

¶ 8     On November 21, 2011, Riverdale Police Lieutenant Bailey and Detective Williams presented a six-person photo array, which included defendant, to Halayna and Janeka at their home. Janeka was unable to make an identification of the offender in the photo array. Halayna,

however, circled the defendant and indicated she was 90 percent sure he was the person she saw run by her after the shooting. Later that day, Lieutenant Bailey and Detective Williams showed the same photo array to Cecil Sr. Cecil Sr. identified the defendant as the person who shot him.

¶ 9 Defendant was arrested on November 30, 2011. On December 1, 2011, defendant was placed in a live lineup. Cecil Sr., Halayna, Janeka, and Justin viewed the live lineup at the Riverdale Police Department. Cecil Sr. and Halayna positively identified the defendant.

¶ 10 Prior to trial, defendant filed a motion to suppress the photo array and live lineup identifications made by Cecil Sr. and Halayna. During the hearing, Riverdale Police Lieutenant Bailey testified he was assigned to investigate the shooting of Cecil Sr. and Justin from October 8, 2011 and he interviewed Janeka, Halayna, and Cecil Sr. Janeka described the offender as a black male of medium build, approximately 5'6" to 5'8" tall, with dreadlocks and possibly a thin beard and stated that the offender was wearing a white shirt, tan pants, and a baseball cap over a white do-rag. Halayna gave a similar description of the man she saw running from the scene of the shooting. She stated that the offender was approximately 5'6" to 5'8" tall, with a medium build and complexion, dreadlocks and a thin beard. Halayna also stated that the man was wearing a white t-shirt, white do-rag, and tan pants. Cecil Sr. described the offender as a black male, approximately 5'8" tall, possibly in his late teens, with a medium build and complexion, wearing a white t-shirt. Based on these descriptions, Lieutenant Bailey assembled a photo array.

¶ 11 The photo array contained six young, black men of medium to dark complexions. The individuals in position one and two had short-cut hairstyles, and the individuals in positions three, four, five, and six had braided dreadlocks. Defendant was in position six. The photo array was viewed by Halayna and Janeka's home on November 21, 2011, at their home. Halayna and Janeka were separated. Before viewing the array, Halayna was informed the suspect may not be

in the photo spread; that she was not obligated to make an identification; and that the officer administering the photo spread may or may not know which person is the suspect in the case. Lieutenant Bailey presented the photo array to Halayna, and she indicated she was almost 90 percent confident that the defendant was the person she saw run past her after the shooting. Lieutenant Bailey testified Halayna circled the defendant's image and wrote "almost positive 90 percent" and "running from the house" on the photo array.

¶ 12 After Halayna left the room, Lieutenant Bailey and Detective Williams explained the photo array advisory form to Janeka and presented her with the same photo array shown to Halayna. Janeka did identify the offender in any of the photographs in the photo array.

¶ 13 About three hours later, Cecil Sr. viewed the photo array. Before he did, he was advised that the suspect may not be in the photospread; that he was not obligated to make an identification; and that the officer administering the photo spread may or may not know who the suspect is. When shown the photo array, Cecil Sr. identified the defendant, circled the picture of the defendant, and wrote "that's the person that shot me" under the defendant's picture before signing the photo array.

¶ 14 After defendant's arrest, Lieutenant Bailey arranged to secure participants for a live lineup. Riverdale Police Department did not have anyone else in custody to place in the lineup with defendant – so to find participants matching the descriptors given by the witnesses, Lieutenant Bailey called other police departments for arrestees and asked for volunteers from within the community to act as fillers for the lineup. Lieutenant Bailey assembled a five-person lineup on December 1, 2011 at the Riverdale Police Department. The lineup consisted of five African- American males. Defendant, who had dreadlocks, three men who had short hairstyles, and one man who had braids. Lieutenant Bailey testified he considered the hairstyles when

selecting the men for the line-up, but also considered other factors such as facial hair, complexion, and age. Lieutenant Bailey further explained that, given the length of time between the shooting on October 8, 2011, and the lineup on December 1, 2011, he considered the fact that the offender may have changed his hairstyle.

¶ 15    Defendant was placed in the lineup wearing the clothing in which he was arrested on November 30, 2011, which included a long sleeve, white t-shirt. Lieutenant Bailey testified that the fact the defendant was in a white shirt for the lineup was not by design. Cecil Sr., Halayna, Janeka, and Justin came to the Riverdale Police station and viewed the lineup individually. Janeka again could not make an identification. Justin also viewed the lineup and could not make an identification.  Halayna identified defendant without hesitation as the person she saw run from the scene.  Cecil Sr. "immediately" identified defendant.

¶ 16    At the hearing, defendant argued that the live lineup was improperly suggestive, as he was the only person with dreadlocks, a white shirt, and youthful face in the live lineup. Defendant also argued that the identifications made on December 1, 2011, were based on the witnesses' prior exposure to the photo array. The circuit court denied defendant's motion to suppress, explaining that the case law is clear – participants in a photo array and lineup need not be identical and that differences in appearance go to the weight of the identification, not to admissibility. The circuit court further found no evidence that the alleged suggestiveness was police engineered or that the photo array or the lineup was unconstitutionally suggestive.

¶ 17    At trial, Cecil Sr. testified defendant approached him while he was walking with Justin, Cecil Jr., and Janeka at the corner of 145th Street and South Wabash Avenue on the evening of October 8, 2011. Cecil Sr. testified that the street was well lit at the time.  Cecil Sr. was the only person in the group to speak to defendant and his conversation with defendant took place right

under the streetlight. The conversation lasted "a good few seconds." Defendant stood roughly three to four feet away from Cecil Sr. During the conversation, Cecil Sr. looked directly at defendant's face, as well as defendant's right hand. Cecil Sr. noticed defendant's hand in his right pocket and shifted his glance from defendant's face to his hand and back again. Cecil Sr. noted defendant was wearing khaki pants, a white t-shirt, and white do-rag, had dreadlocks and a birthmark on his forehead.

¶ 18    During their conversation, defendant repeatedly insisted that he, Justin, Cecil Jr., and Janeka give him some unspecified items. When defendant commanded them to "give it here," Cecil Sr. believed defendant was trying to rob them. After telling defendant they did not have anything for him, Cecil Sr. turned away and began walking to his mother's house. As he walked away, Cecil Sr. heard Janeka say "he got a gun" and then heard gunshots coming from the direction of the defendant. Cecil Sr. ran to his mother's house, and as he ran, heard additional gunshots. Cecil Sr. recalled seeing muzzle fire coming from the area where defendant was standing just before he was struck in the back with a bullet.

¶ 19    After the shooting, Cecil Sr. viewed a photo array at his home. He testified that he read and initialed a photo array advisory form. He was aware that the suspect may not be in photo spread, that he was not obligated to make an identification, and that he was not to assume that the officer administering the photo spread knew which person was the suspect in the case. When he viewed the array, Cecil Sr. circled the individual in position six and wrote "that's the person that shot me." At the time of the photo array, he was 120% sure the person he identified was the shooter. He saw, and identified defendant, as the same person in court.

¶ 20    Cecil Sr. then testified he viewed a lineup at the Riverdale Police Department on December 1, 2011 and was again advised that the offender may or may not be in the live lineup,

that he was not obligated to make an identification, and that he was not to assume that the officer administering the lineup knew which person was the suspect in the case. He identified defendant in the lineup and confirmed that the person he identified in the lineup was the same person he had previously identified in the photo array and the same person he identified in court. Cecil Sr. again stated he was 120 percent sure of his identification.

¶ 21    Justin testified he was walking to his mother's home with Cecil Sr., Cecil Jr., and Janeka when he saw three men in the street. One of the men approached and had words with Cecil Sr. on the corner. The man said, "something along the line as give me what you got." As they were talking, Justin turned around and walked toward his mother's house before Cecil Sr. ended his conversation with the man. As he was walking back toward the house, Justin heard Janeka scream and then heard gunshots behind him. Justin ran to the house, and once inside, realized he had been shot in the back.

¶ 22    Justin testified that did not get a good look at the man's face and would never have been able to identify him. Justin stated he needed glasses to help his vision but was not wearing glasses or contacts on the day of the shooting. Justin participated in a line up on December 1, 2011 but was unable to identify anyone.

¶ 23    Janeka testified she left her mother's house with Cecil Jr. on October 8, 2011, in order to meet Cecil Sr. at the bus stop. Janeka met up with Cecil Sr. and Justin as they were walking, and the group continued back to her mother's house together. Janeka saw three men in the middle of the street. One of the men - an African American with dreadlocks wearing khaki pants, a white t-shirt and white do-rag - approached them and asked, "what they got." Janeka recalled that the streetlights were illuminated, and she could see the clothing of the man who approached them

but could not see his face. Janeka explained she had trouble seeing his face because she was not wearing her contact lenses or glasses at the time.

¶ 24    While on the street, Janeka watched the individual who approached them remove his right hand from his pocket and pull out a gun. She shouted and saw the same man fire the gun in Justin's direction. Janeka ran to the house and told Halayna that Justin had been shot. Halayna then ran outside, and she followed. Janeka heard Halayna yelling and then saw the same person she saw shooting run past Halayna.

¶ 25    Janeka stated that when she later spoke with the police, she explained her eyesight difficulty and inability to see the shooter's face. When she was given an opportunity to view the photo array and live lineup, Janeka indicated she was unable to identify anyone because of her poor eyesight.

¶ 26    Halayna testified she was at her mother's home on the night of October 8, 2011 when she heard banging on the door. When she opened it, Janeka was there and told her that Justin had just been shot. Halayna ran out of the door, down the gangway, and then out to Wabash Avenue, screaming for Justin. While in the middle of street, Halayna saw two men run by, but did not see their faces.  Then she saw defendant running toward her. The street was illuminated with streetlights, and she could see that defendant had his hand in his right pocket.  He had a mark on his face, and was wearing khaki pants, a white t-shirt, and a white do-rag. She made eye contact with defendant and looked "dead at him," when they were only two to three feet apart.  Halayna could not recall how long she was able to see defendant's face, but testified "at that particular time, it seemed like I was looking at him forever, but I know I wasn't." Halayna further stated defendant appeared to do a double take and looked shocked when he saw her in the street. Halayna shouted at defendant as he passed her and chased him to an alley until she lost sight of

him. As she chased him, defendant turned his head such that she could see the side of defendant's face twice more.

¶ 27    After speaking with the police, Halayna viewed a photo array at her home on November 21, 2011.  Halayna was given a photo array advisory form, which she signed and initialed, and confirmed she was informed that the offender may not be in the photo spread; that she was not required to make an identification, and that the officer administering the photo array may or may not know who the offender is. After viewing the array, she circled defendant in position six and wrote 90 percent on the document because, at that time, she was 90 percent sure that the person she circled was the person she saw run by her after the shooting.

¶ 28    Halayna later viewed a live lineup at the Riverdale Police Department on December 1, 201.  She was shown the lineup advisory form that he had previously signed and was again informed that the offender may or may not be in the lineup that she was not required to make an identification, and that the officer administering the lineup may not know who the offender is. Halayna testified when she saw defendant's face in position two, she became emotional and started to cry because she was "one hundred percent" sure   "that was the person that I saw running that looked at me that I felt at the time had shot my brother."  When she was asked by the ASA what the difference was between the ninety percent certainty from the photo array to the hundred percent certainty during the physical lineup, Halayna stated, "[b]because when I saw him, when he held his head up, he was – his – it seemed at that moment he was just as close to me as when he was running, and there was no doubt in my mind that was the person."

¶ 29    On cross-examination, defense counsel asked Halayna about the live lineup and whether defendant was the only person to appear in the lineup "with hair" and a young face. Halayna stated there were only two individuals in the lineup with relatively long hair but responded she

did not believe defendant appeared younger than the other individual in the lineup with hair and that she did not pick defendant because he looked young.

¶ 30    On re-direct, Halayna stated, "I picked out Number 2 because when I looked at him and he held his face up, Number 2 was the face that I saw ran pass me that looked at me. (sic) That was Number 2. That's why I picked him." She denied picking out defendant because he was the only one wearing a white shirt or because he was the only one with dreadlocks.   Halayna further stated that when she saw defendant on October 8, 2011, he had a do-rag on, and therefore did not know what type of hair defendant had, only that it was visible extending below the do-rag.

¶ 31    Lieutenant Bailey testified to the course of his investigation.  Bailey testified that with respect to the live lineup with Halayna, he saw Halayna become "visibly shaken" while viewing the live lineup and stated she did not hesitate in any way before making the identification of defendant on December 1, 2011.

¶ 32    The State rested. Defendant moved for a directed verdict, which was denied.  Defendant presented Isaiah Williams, who testified that he was at his aunt's house in the area of 144th Street and South Wabash Avenue on October 8, 2011, when he heard a gunshot and saw a person running down Wabash Avenue. Williams testified that he did not see anyone chasing after the person he saw running down the street. Williams stated that he spoke to police after making these observations and gave a description of the person he saw running down the street. Williams testified on cross-examination,  that he was not able to see the face of the person he saw running down the street after the gunshots. Defendant rested.

¶ 33    The jury found defendant guilty of the aggravated battery of Cecil Sr. and Justin, and the attempt armed robbery of Cecil Sr., Justin, Cecil Jr., and Janeka.

¶ 34    The court denied defendant's subsequent motion for a new trial.  Defendant was

sentenced to 12 years' imprisonment on each aggravated battery count and eight-year terms in for each attempt armed robbery count, with those sentences to run concurrently. This appeal followed.

¶ 35                                    ANALYSIS

¶ 36     Defendant first argues that the trial court erred when it denied his motion to suppress Halayna's and Cecil Sr.'s identifications during the live lineup. Defendant argues that the live lineup was unnecessarily suggestive because defendant was the only person in the lineup who matched Halayna and Cecil Sr.'s prior description.  Defendant also argues that  Halayna's increasing certainty of her identification of defendant between the photo array and live lineup further supports the fact that the live lineup was unduly suggestive. Finally, defendant argues that the State cannot demonstrate that Halayna's in-court identification was independent from the suggestive lineup, and therefore Halayna's in-court identification also requires suppression.

¶ 37      A ruling on a motion to suppress is subject to a mixed standard of review. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). The trial court's factual findings are entitled to deference, given that the trial court is in a superior position to weigh the credibility  of witnesses, and we will uphold such findings unless they are contrary to the manifest weight of the evidence. *Id*. However, the ultimate legal question of suppression is subject to *de novo* review. *Id.*

¶ 38     On a motion to suppress identification, the defendant bears the burden of establishing, within the totality of the circumstances, the pretrial identification was so unnecessarily suggestive that it gave rise to a substantial likelihood of an unreliable identification. *People v. Denton*, 329 Ill. App. 3d 246, 250 (2002). Individuals selected for a lineup need not be physically identical. *Id.* "Differences in their appearance go to the weight of the identification, not to its admissibility." *Id.* " 'Only where a pretrial encounter resulting in an identification is

11

'unnecessarily suggestive' or 'impermissibly suggestive' so as to produce 'a very substantial likelihood of irreparable misidentification' is evidence of that and any subsequent identification excluded by law under the due process clause of the 14th Amendment.' " *People v. Love*, 377 Ill. App. 3d 306, 311 (2007) (quoting *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994) ). The law does not require the participants in a lineup to be nearly identical, nor to exactly match the descriptions given by eyewitnesses. *Love*, 377 Ill. App. 3d at 311. The suggestibility of a lineup depends on " 'the strength of the suggestion made to the witness' " and, whether, through " 'some specific activity on the part of the police, the witness is shown an individual who is more or less spotlighted by the authorities.' " *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (quoting *People v. Johnson*, 149 Ill. 2d 118, 147 (1992) ). Courts must examine the totality of the circumstances in determining whether a defendant has met the burden of showing the identification procedure was impermissibly suggestive. *People v. Prince*, 362 Ill. App. 3d 762, 771 (2005). If a defendant satisfies this burden of proof, only then will the burden shift to the State to show, by clear and convincing evidence, an independent basis of reliability for a later identification. *Id*.

¶ 39     In this case, defendant argues that he stood out in the lineup because he was the only individual in the lineup that matched the description provided by the eyewitnesses; he was wearing a white shirt and had dreadlocks.  However, there is no evidence in this case that the identification procedures were impermissibly suggestive. The witnesses who viewed the lineup read and signed the lineup advisory forms which informed them that they were not required to make identification and the offender might not be in the lineup.  Our review of a photograph of the lineup participants shows that the five participants appear to be of the same age and skin tone. All five of the participants were of similar height and weight.  Two had longer hair, one in

braids and one in dreadlocks, and three had short hair. Three wore colored shirts and two wore white shirts. No one in the lineup stood out more than anyone else. See *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57, (lineup participants are not required to be identical or near identical). Furthermore, defendant does not argue that the police forced him to wear dreadlocks or a white shirt, nor engaged in any specific activity to emphasize defendant. See *Gabriel*, 398 Ill. App. 3d at 349. Defendant cannot claim improper influence here where he simply wore his own clothing and hairstyle in the lineup. *People v. Jonson*, 149 Ill. 2d 118, 147 (1992).

¶ 40    In addition, this court has held that a lineup is not suggestive merely because the defendant is the only person wearing a specific item of clothing, even where that piece of clothing was purportedly worn by the offender at the time of the offense. See, e.g., *Gabriel*, 398 Ill. App. 3d at 349 (lineup not overly suggestive where the defendant was the only one wearing a white T-shirt); *People v. Peterson*, 311 Ill. App. 3d 38, 49 (1999) (lineup not unduly suggestive when the defendant was the only one present wearing a gray sweatshirt); and *People v. Faber*, 2012 IL App (1st) 093273 (lineup not suggestive where the defendant was the only participant wearing a sleeveless t-shirt a witness described the offender as wearing).

¶ 41    Likewise, this court has routinely recognized that a lineup is not impermissibly suggestive where "the defendant was the only person in the lineup with braided hair." *People v. Love*, 377 Ill. App. 3d 306, 311 (2007); see also *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999) ("[D]efendant's hairstyles in the lineups (both the french braids and the Afro) were not so distinctive that they rendered the lineups unduly suggestive."); *People v. Trass*, 136 Ill. App. 3d 455, 463 (1985) ("The fact that [defendant] was the only man in the lineup with braided hair does not establish that the lineup was impermissibly suggestive * * *.").

¶ 42    Based on our review of the photo array and lineup, as well as relevant case law, we reject

defendant's contention that the lineup in this case was impermissibly suggestive. Therefore, we cannot find that the trial court's decision to deny defendant's motion to suppress identification was against the manifest weight of the evidence.

¶ 43    We similarly reject defendant's argument that Halayna's increasing certainty of her identification of defendant between the photo array and live lineup further supports the fact that the live lineup was unduly suggestive. Defendant suggests that the in light of the photo array Cecil Sr. and Halayna viewed prior to the live lineup, there could be no doubt what "the right answer" was in the lineup.

¶ 44    We disagree. The mere fact that defendant was the only person in both the photo array and the lineup does not render the lineup suggestive. *Id.* at 148; *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 26.

¶ 45    Finally, defendant argues that the State cannot demonstrate that Halayna's in-court identification was independent from the suggestive lineup, and therefore Halayna's in-court identification also requires suppression. As we have found that defendant has not shown that the lineup was suggestive, we need not address this argument.

¶ 46                                    CONCLUSION

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 48    Affirmed.