2021 IL App (1st) 182119-U

No. 1-18-2119

Order filed June 25, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 225801 |
| | ) | |
| TRAMELL MCGRAW-ANDERSON, | ) | Honorable |
| | ) | Lawrence Edward Flood, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Harris and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm where: (1) defendant was not entitled to have his first degree murder reduced to second degree murder when he failed to prove by a preponderance of the evidence that there was imminent danger or harm to justify his use of deadly force; (2) defendant's contention that the trial court failed to *sua sponte* provide Criminal IPI 4.13 (Illinois Pattern Jury Instructions, Criminal, No. 4.13 (4th ed. 2000) to the jury was not reviewable under plain error and he was not prejudiced by his trial counsel's failure to request the instruction; (3) the State's rebuttal argument did not deny defendant a fair trial where the State's remarks were in response to defense counsel's closing argument or were harmless error where the evidence of defendant's guilt was not closely balanced.

¶ 2     Following a jury trial, defendant Tramell McGraw-Anderson was convicted of first degree murder and personal discharge of a firearm that proximately caused the victim's death. Defendant was sentenced to 25 years' imprisonment for murder and a 20-year firearm enhancement, for a total 45-year sentence. On appeal, defendant contends that: (1) his conviction for first degree murder should be reduced to second degree murder; (2) he was denied a fair trial where the trial court failed to provide Illinois Pattern Instruction (IPI) 4.13, "definition of reasonable belief," alternately, trial counsel was ineffective for failing to request Criminal IPI 4.13 (IPI 4.13) (Illinois Pattern Jury Instructions, Criminal, No. 4.13 (4th ed. 2000)); and (3) he was denied a fair trial where the State engaged in a pattern of misconduct during rebuttal argument, that created a serious risk that the jury's verdict was based on a misunderstanding of the law rather than the evidence. For the following reasons, we affirm.

¶ 3                                     BACKGROUND

¶ 4     The circumstances surrounding defendant's conviction stem from the shooting death of 14-year-old Tommie McNeal at approximately 1:30 p.m. on September 20, 2013, in the gangway at 6919 South Vernon in Chicago. Prior to trial, defense counsel made a hearsay objection to the State's plan to play the audio recordings of 911 calls made in connection with the shooting by witnesses who were scheduled to testify. The trial court overruled the hearsay objection on the basis that they were excited utterance exceptions. The trial court ruled however that the witnesses could not testify to the contents of the calls. Defendant's trial commenced on June 28, 2017, where the following evidence was presented.

¶ 5                                 A. The State's Case

¶ 6    Angel Christmas, the victim's mother, identified life and death photos of the victim.[1]  She stated that she last saw the victim alive on the morning of September 20, 2013, when he left for school.  The next time she saw him was after the shooting and she later identified his body at the morgue.

¶ 7    Bryan Dickerson, a satellite technician, testified that he was supervising the installation of a satellite dish two doors south of 6919 South Vernon. He was on the roof working when he heard gunshots and looked in the direction from where he heard them. Dickerson saw a man in a backyard two doors down putting a long rifle in a backpack, so he called 911. Dickerson described the man as heavyset, approximately 38 years old, wearing a black t-shirt and having a mini afro. Dickerson stated that he did not speak to police at the scene because he was afraid; instead, he met them at a nearby location to provide a statement.

¶ 8    On cross examination, Dickerson clarified that he heard gunshots, ducked down and called the police.  When he stood back up, the man with the gun was gone. Dickerson further stated that he did not see the man struggle with anyone before the shooting.

¶ 9    Nina Buchanan testified that she lived in the first floor apartment at 6923 South Vernon, which was next door to where the shooting occurred. She heard three gunshots that sounded like they were close, from the backyard next door, and she went to the window to look. Buchanan stated that she saw defendant, who she identified in court, put a gun in a gym bag.  Defendant was dressed in all black, had "nappy hair" and a beard. Buchanan saw defendant talking to a little boy on a bike, who she knew from the neighborhood, before defendant walked off towards the alley. Buchanan then called the police. She later identified defendant from a photo array at the police

---

[1] No photographs were included with the record filed on appeal.

station and then later from a physical lineup. Buchanan also testified that she heard defendant say, "I'm tired of this sh*t." On cross examination, Buchanan stated that she did not witness a fight or struggle before she heard the shots.

¶ 10    Henry Taylor, who was 27 years old at the time of trial, testified that on September 19, 2013, he went to Angelo Howard's house at 6919 South Vernon, sometime between 8 and 9 p.m. He stated that there were other people present in the house that night, including a younger boy, Chauncey, who arrived after he did. Taylor stated that he invited defendant over. He knew defendant for about 10 years prior through a mutual friend. Taylor met defendant at a nearby bus stop, and he was carrying a book bag. When they got back to Angelo's, he took defendant into the back room, where defendant showed him a rifle. The rifle was in pieces and defendant put it together. When Angelo arrived, he came to the back room, and defendant showed him the gun also. Chauncey came to the back room and wanted to see the gun, but defendant did not show him the gun. Everyone slept over at Angelo's house that night.

¶ 11    The following morning, defendant and Henry left to meet defendant's aunt. Defendant took the bag and gun with him when they left. They later returned to Angelo's house and hung out on the porch. The victim later arrived; Henry was familiar with him from the neighborhood. Henry and Angelo walked to the store, but defendant stayed behind with the victim and Chauncey. When they came back, everyone sat on the porch. Defendant called Henry to the gangway and said that the victim and Chauncey were whispering and plotting to take his gun, so he had to put it in the garage. Henry told defendant that he did not think so and walked away. Henry stated that defendant was "jittery and afraid." Nevertheless, Henry then went back to the front porch and told everyone to "boast," meaning that they should say whatever they had going on, whatever plots they had.

Henry then told everyone to leave and proceeded to walk to the corner with Angelo. While standing at the corner, Henry heard gunshots and turned around towards the house, where he saw people running and the victim lying face down in the gangway. Henry saw defendant exiting the alley towards the bus stop and asked him what happened. Henry admitted that he did not talk to the police and left Angelo's house after the shooting.

¶ 12    Defendant called Henry the next day, and Henry met him at a laundromat on 71st and Western, where defendant asked him for money to get out of town. Henry spoke with the police on September 22, 2013, at which time he gave a written statement. In the statement, Henry told police that he ran to defendant after the shooting and told him it was "bogus and he just killed shorty." Henry also told police that defendant said he was going to Texas or Miami, stating that he was going to make a run for it. Henry asked defendant why he did not just shoot in the air if he was trying to scare the victim. Defendant responded that he was going to try and beat it as self-defense because he had a firearm owner identification (FOID) card and badge. Henry's statement also indicated that when they were looking at the gun the night before the shooting and Chauncey wanted to see it, defendant said "no, [he] didn't want any young [mfs] around."

¶ 13    On cross examination, Henry stated that people kept and or hid stuff at Angelo's house, including guns. He also stated that Chauncey wanted to shoot the gun, but defendant said no. Henry also stated that he and defendant were planning to go to the gun range on the day of the shooting. He admitted that the car parked in front of Angelo's house was stolen and that he saw a white van belonging to Charlie, the neighborhood drunk, near Angelo's house that day. On recross examination, Henry stated that he thought something was going to happen and so he and Angelo left. He did not see the fight between defendant and the victim, but he heard the shots and saw the

victim go down. Henry again stated that defendant seemed afraid, nervous and worried. Henry was impeached with his criminal record, three retail thefts and one possession of a stolen motor vehicle, and admitted that he was under arrest when his statement was made to police.

¶ 14    Pretic Howard, also known as "Angelo," was 25 years old at the time of trial, and testified that he had a conviction for possession of a stolen motor vehicle; namely the stolen car that was in front of his house on the day of the shooting. Angelo stated that he lived at 6919 South Vernon in 2013; the property belonged to his family and he lived on the top floor. His family also owned the property next door, and Buchanan was his relative. He did not consider his house to be a "trap house" where guns and drugs were stored. Angelo knew Henry since high school, and it was not unusual for him to spend the night. Henry asked if defendant could come over, and Angelo was fine with it, even though he did not know defendant. Angelo stated that there were no other guests at his home at the time. Angelo went downstairs to visit his mother and when he returned, Henry and defendant were watching television in the guest room in the back of the apartment, which Henry used when he stayed over.  He identified defendant in court, stating that defendant had an assault rifle with him that night. Angelo testified that 15-year-old Chauncey came over later; he used to babysit Chauncey and was also dating his sister at the time, so it was not unusual for Chauncey to be at his house. The gun was broken down and put away before Chauncey was let into the room and Angelo subsequently sent him to another room. Angelo further indicated that everyone slept over; Chauncey was in the room with him.

¶ 15    The following day, the victim came over with a PlayStation to play video games with Chauncey, but they were unable to get the game working, so the kids were just hanging outside on the porch with them. He saw defendant and Henry talking when he left to walk to the store. Henry

caught up with him and after talking to him, Angelo was going to tell both boys to leave. He turned towards his house and called out to the victim when he heard six shots. Angelo immediately called the police after he saw the victim fall forward. He and Chauncey stayed with the victim in the gangway and held his head, but the victim died just as police arrived. Angelo explained that he was saw defendant walk to the bus stop at 69th and King Drive because the way his yard was set up, defendant had to walk by him to leave. Angelo also stated that he was not really paying attention to defendant because his focus was on the victim. He stated that defendant did not offer assistance, say anything to anyone or call 911. He also denied seeing a fight between defendant and the victim. Angelo identified defendant after the shooting in a lineup.

¶ 16    On cross examination, Angelo testified that he saw Charlie, the neighborhood drunk, and another man in a van, circling the block. The van was out front but left at some point. Angelo also stated that Jamal Woods came to his house on a bike and asked him to hide a gun. Angelo put the gun in the stolen car that was parked in front of his house.

¶ 17    Before the State called its next witness, Chauncey Nichols Jones, defendant requested to impeach him with his prior juvenile adjudications. The trial court denied the request upon learning that he was currently incarcerated and would be testifying while dressed in a prison uniform.

¶ 18    Chauncey, who was 15 years old when the shooting happened, testified that he was in jail for armed robbery with a firearm at the time of trial. He stated that he spent the night at Angelo's the night before the shooting, but did not see defendant or Henry until the next day. Chauncey identified defendant in court as one of the people he saw the next day when he went outside. He stated that he saw defendant in the back room with a gun, and further that defendant poured urine on the victim's bike from the back porch; Angelo's bathroom was broken and so they used a

bucket. With regard to the shooting, Chauncey stated that he was on his bike when he saw defendant standing in the backyard pointing a gun down the gangway. He heard 12 shots and went into the garage. Defendant ran to him and asked him if "[he] want some of that sh*t too." Chauncey did not answer, and defendant went back through the garage to the backyard, through the gangway and out to the front. He then saw defendant running towards 69th and King Drive. Chauncey left and went to the victim's house to let his family know about the shooting. He later identified defendant from a photo array on September 24, 2013, because he "murdered [his] homie," and from a lineup on October 26, 2013.

¶ 19     On cross examination, Chauncey testified that he went to Angelo's house to get high and sleep because his foster mother had put him out because he was suspended from school. He also stated that he and the victim tried hook up the PlayStation, but it would not work with any of the televisions in Angelo's house. Chauncey admitted that he saw Charlie near Angelo's house on the day of the shooting.

¶ 20     Chicago police officer Stephen Balcerzak testified that he was an evidence technician who was assigned to process the scene of the shooting with Officer Zbigniew Niewdach, a forensic investigator. At the scene, he recovered expended shell casings and metal fragments. Balcerzak stated that he also noted things that were damaged by projectiles from the fired bullets; specifically, he noted projectile damage to the driver's door and fender of a white car parked in front of the house, and he recovered a metal fragment from the interior door jamb. He recovered six shell casings, one of which was under the white car and two were in the backyard. Balcerzak testified that the shell casings came from an automatic weapon, and all recovered casings were inventoried.

¶ 21    On cross-examination, Balcerzak identified a photo that he took of a knife that was found in the victim's left jacket pocket.  He also testified that there was some projectile damage to the downspout and that the brickwork was "somewhat" damaged.

¶ 22    Chicago police officer Michael Orlando testified that he was working as a narcotics officer observing a controlled drug buy near 4906 West Iowa on the westside of Chicago on October 15, 2013. After the drug buy, he got consent to search that address, where he found a duffle bag containing the upper part of an AR-15 and loose rounds.  An envelope with the name "Shanaria Stenley" on it was also found in the duffle bag.  Defendant was not apprehended at that address.

¶ 23    Kellen Hunter, a forensic scientist, testified that he examined the shell casings that were recovered from the shooting scene on September 26, 2013, and identified them as Federal .223 Remington rifle caliber rounds that were fired from the same gun. He also received the upper part of the AR-15 that was recovered and test-fired it after attaching it to another bottom part that was present in the lab. When assembled, Hunter stated that the AR-15 was generally fired from the shoulder and required between 5 and 12 pounds of force to fire the trigger. The AR-15 also had very little recoil.  Hunter determined that, after comparing the shell casing from the test shoot with the shells recovered from the scene, the six casings were fired from the recovered weapon.

¶ 24    The State then presented the rest of its evidence by way of stipulations. First, the parties stipulated that Shanaria Stenley was defendant's mother. Next, the parties stipulated that evidence technician James McDonough recovered and inventoried the victim's clothes, blood card and fired bullet from his body.

¶ 25    The parties further stipulated that Dr. Kristen Escobar Alvarenga, an assistant medical examiner, performed an autopsy on the victim's body. She found multiple gunshot wounds but no

stippling. There was an entry wound on the victim's right thigh which had a trajectory downward, back to front, and exited the same thigh. There was a second entry wound on the left side of the victim's back which had a trajectory upward and traveled to the victim's chest and exited on the upper right side of the victim's chest after striking his lung and aorta among other things. Dr. Alvarenga also noted abrasions to the victim's bodies as follows: (1) one-fourth inch red/purple abrasion on the right side of the face; (2) three-fourths inch abrasion on the middle of the lower lip; (3) three and one-fourth inch cluster of abrasions across the chin; (4) one and one-half inch red/purple abrasion on the lower right flank; (5) one-fourth inch red/purple abrasion on the right thigh; (6) one and one-fourth inch red/purple abrasion on the right knee; and (7) one and one-fourth inch red/purple abrasion on the right leg. Dr. Alvarenga concluded that the manner of the victim's death was homicide.

¶ 26 Chicago police sergeant Cullen Murphy testified that he was assigned to investigate a homicide at 69th and Vernon on September 20, 2013, between 1:30 and 1:45 p.m. with a team. When he arrived, he saw shell casings and a young male lying face down on the sideway near the parkway grass. The victim was declared dead at the scene. Murphy identified a photograph of a small, folded knife that was recovered from the victim's pocket. He spoke with Buchanan, Angelo and Dickerson regarding the shooting. He later spoke with Henry, who provided him with defendant's name, after which, he was able to generate photo arrays. Buchanan identified defendant from a photo array on September 22, 2013, and Chauncey identified defendant from a photo array on September 24, 2013. Murphy submitted an investigative alert to look for defendant, which was unsuccessful. He also obtained an arrest warrant for defendant. On October 15, 2013, Murphy learned that a rifle barrel was recovered in a separate incident, and later learned that it was

a match for the gun used in the September 20, 2013, shooting. Murphy contacted Crime Stoppers on October 25, 2013, and was subsequently contacted by Hamit Brown. Defendant was ultimately located at 7147 South Seeley; Murphy identified defendant in court as the offender. After defendant was arrested, he was placed in a lineup, where he was identified by Chauncey, Buchanan and Angelo. Defendant was subsequently charged with first degree murder.

¶ 27    On cross examination, Murphy stated that he was not familiar with whether the shooting occurred in a high-crime area but based on the situation he would agree. He confirmed that Dickerson was interviewed elsewhere because he was not comfortable in the area. Murphy acknowledged that defendant did not resist arrest, and identified what purported to be blood spatter in a photograph.[2]

¶ 28    When the State rested, defendant made an oral motion for directed finding, which was denied by the trial court. The case then proceeded to defendant's case-in-chief.

¶ 29                              B. Defendant's Case

¶ 30    Prior to defendant's testimony, the State moved to bar defendant from testifying about an alleged conversation between himself and a third party in which he was asked if he would sell the gun or allow them to shoot the gun. The State argued that defendant was attempting to bolster his own testimony with hearsay statements offered for the truth of the matter asserted. Defense counsel argued that the statements would show defendant's state of mind prior to the shooting. The trial court granted the State's motion to bar testimony about the content of the conversation because it was hearsay.

---

[2] Defense counsel showed Murphy several photos from the scene, but he was unable to conclusively identify blood spatter in the photos, until the last photo which he indicated could show blood spatter.

¶ 31    Defendant testified on his own behalf that he was 26 years old at the time of trial. At the time of the incident, he was a student at Harold Washington College and worked as an unarmed security guard. He purchased an AR-15 from Midwest Sporting, and obtained a FOID card. On September 19, 2013, he met Henry at 69th and King Drive; they then went to Angelo's house. Defendant stated that he had known Henry for approximately 13 years but had never met Angelo before that night. Defendant explained that he had his gun with him because he was planning to go to the gun range the next day. When defendant arrived at Angelo's house, the gun was broken down inside his duffle bag. He showed the gun to Henry and was putting it away when Angelo knocked on the door to the back room. The gun was already broken down and put back in the bag. Henry asked him to show the gun to Angelo, so defendant put it back together and showed it to Angelo. Approximately 10 to 15 minutes later, Chauncey came to the door. Defendant did not show the gun to him, but broke it down again and put it back in the bag. He spent the night with Henry at Angelo's, and stated that he saw a .45 caliber SD40 that Henry had in a dresser.

¶ 32    The following morning, he and Henry left to get money from his aunt so that they could go to the gun range. Defendant had the gun with him when they left. When they returned to Angelo's home, defendant, Angelo, Henry and Chauncey hung out on the porch. Shortly thereafter, another young boy, the victim, arrived. Henry and Angelo left between 10 and 10:30 a.m., leaving defendant with Chauncey and the victim. Defendant stated that he later saw Chauncy and the victim talking to two older men in a van in front of the house, but he could not hear what they were saying. He then left the porch to go to the white car because he saw the group making hand gestures that he believed were like a gun and saw them approaching the white car. Defendant testified that as he stood by the back of the car, Charlie opened one of the car's doors and the other man

approached him and they had a short conversation. At some point, defendant had placed his gun inside the trunk of a white car parked in front of the house after Henry and Angelo left so that he could see where it was. He described Charlie as being an older, bald man who was "rough in the face," and he described Charlie's companion as being an older man, who was shorter than Charlie and stocky. Defendant stated that he felt that something was wrong after the conversation and he was scared. He called Henry and asked him to come back so he could tell him what happened. Meanwhile, defendant removed the gun from the trunk of the white car and placed it in Angelo's garage. Defendant testified that Angelo told him earlier that there was a gun in the white car.

¶ 33    When Henry and Angelo came back, defendant saw Charlie's van in the alley by the garage. The second man was inside of the van, but defendant could not see where Charlie was. Defendant talked to Henry in front of the gangway and told him what happened. Henry left again with Angelo, and defendant went back to the garage to get the gun. While he was in the garage, he overheard a conversation between Chauncey and the men in the van. Defendant testified that he heard a conversation about "hitting a stain," which was slang for robbery, and he thought it was about him. At that point, defendant took the gun out of the bag and assembled it to prep for the "immediate threat of them attacking [him]." Defendant then walked down the gangway backwards when he heard footsteps behind him. When defendant turned around, he was face-to-face with the victim. He stated that he could hear the victim's footsteps because he dragged his feet when he walked. The victim "rushed" him for the gun, and they fought. Defendant testified that the victim swung at him first, defendant dropped the gun and he fought with the victim. He stated that they exchanged blows for approximately 30 seconds to one minute, but eventually he wrestled the victim to the ground. Defendant then retrieved the gun. When he heard footsteps, defendant turned

around and fired the gun sporadically and randomly to warn "him" to stay away because he was afraid of being attacked again, and he did not know where the others were. Defendant testified that the van was no longer in the back when he retrieved the gun. He fired the gun with one hand and did not hold it on his shoulder. He saw the victim make it to the end of the gangway and fall forward; he thought the victim tripped.

¶ 34     Defendant dismantled the gun and was about to leave when Chauncey showed up. He stated that he did not threaten Chauncey, he just put the gun away and told Chauncey that his friend might be hurt so he should check on him. Defendant then went through the alley towards the front and went to the bus stop at 69th and King Drive. He did not wait for the police because he was afraid that the guys may be there; he left and went to his mom's house on the west side at 4906 West Iowa and left the gun there. Defendant later learned that the victim died and stated that he did not call the police or turn himself in because he was scared.

¶ 35     Defendant admitted that he saw Henry the next day at 71st and Western but did not tell Henry that he would beat the case. He stated that he told Henry what happened. While defendant testified that he did not flee, he admitted that he was not in Chicago but was in Ford Heights after the victim's death. Defendant stated that he did not have a disagreement with the victim; his disagreement was with Chauncey about showing him the gun. Defendant further stated that he only had the gun for a week and had never used it.

¶ 36     On cross examination, defendant stated that he ordered the AR-15 on August 5, 2013, and got it on September 4, 2013. He admitted that he had no card to carry a weapon as an armed security guard and further that he had no authority to carry the AR-15. Defendant stated that he talked to Henry on September 19, 2013, about going to the gun range to shoot the gun, and met

Henry at Angelo's because Henry was staying there. He testified that he did not want to show the gun to a kid and further that he first put the gun in the trunk of the white car overnight. Defendant admitted that the next morning, he took the gun with him when he and Henry went to his aunt's house to get money because Henry did not have money to go to the gun range. They did not go immediately to the gun range because defendant arranged for a ride to pick them up from Angelo's.

¶ 37    Defendant confirmed that he saw the conversation with gestures from the porch, but he stayed even though he felt threatened. He admitted that neither Chauncey, the victim, Charlie or the other man did anything to him. Defendant stated that he did not put his gun in the car in the men's presence, and he was planning to grab it and leave. Instead, he put the gun in the garage after his conversation with Charlie's companion. When questioned about why he removed the gun from the locked trunk of the white car and did not put it inside the house, defendant admitted that he knew that the garage was unlocked and open, and that he could still keep an eye on it in the garage because it was just only a short distance away. He also admitted that he did not leave at that time, even though he felt that something was going on and he wanted to leave. Defendant stated that he went back to the porch to wait for Henry so that he could talk to him and make sure that nothing was going on with Henry. However, defendant admitted that after his conversation with Henry, he went to the garage, where he overheard the conversation about the "stain." He also admitted that he only saw the second man but not Chauncey or Charlie and that he assumed that they were there because he thought he heard Chauncey's voice. Defendant stated that he put the gun together to prepare for the immediate threat but admitted that he did not call 911 or move to the front of the house away from the theat. He also admitted that no one demanded any property from him.

¶ 38    Defendant stated that it took him about 15 to 30 seconds to assemble the gun outside of the garage, and that he had already loaded it earlier that day because it was his practice to have ammunition in a gun before taking it to the gun range. He admitted that no one approached him while he was assembling the gun. Defendant also admitted that the victim had no weapon and they engaged in a fist fight after the victim rushed him, which made him drop the gun. He stated that while he was backing down the gangway, he held the rifle properly at shoulder level with the barrel pointing downward. Defendant stated that he wrestled the victim to the ground and crawled over to the gun.  He admitted that: the victim never went for the gun; he was facing the alley when he reached for the gun; and the fight had ended when he picked up the gun. When he heard footsteps behind him the second time after he picked up the gun, he did not know at the time that the victim was running down the gangway away from him and he did not look before he started shooting in "desperation." Defendant stated that he was not holding the rifle properly when he fired it. After the shooting, defendant admitted that he just broke down the gun to leave, but exchanged some words with Chauncey, told him that he did not want any problems and to check on his friend before defendant left the area. He also admitted that he left the area without calling the police.

¶ 39    On redirect, defendant stated that he moved the gun from the car to the garage because he felt it was safer to move it away from where the guys were located. He also stated that he waited to talk to Henry because Henry knew those people, and he wanted to make sure he was not being paranoid. Defendant additionally stated that two to three minutes passed between the conversation with Charlie's friend by the white car in the front and the conversation he overheard near the garage about the "stain."

¶ 40    At the close of defendant's case-in-chief, the State sought to bar the self-defense instruction, but the trial court denied it on the basis that it was required to give the instruction, even if there was only slight evidence presented of self-defense. The court found that such evidence was very slight in this case, but that it had to give the instruction.

¶ 41    During its closing argument, the State argued that defendant had several times he could have left if he was afraid but chose instead to stay. The State also reiterated that the victim was a 14-year-old boy.

¶ 42    In response, defense counsel argued that defendant felt threatened by what he believed was a plot by the two boys and two adult males to rob him. Defense counsel also argued that the victim swung on defendant first, and based on his belief, he fired his gun sporadically in the direction he heard the footsteps.

¶ 43    In rebuttal, the State argued that the victim weighed "barely 80 pounds." The State also argued that there was no proof of a plot to rob defendant and defendant killed the victim from long range based on the findings in the medical examiner's report.

¶ 44    At the end of the closing arguments, the trial court admonished the jury that arguments by the attorneys were not evidence. The court gave the jury instructions, including the self-defense instruction, and explained four different times to the jury that the defendant would have to believe the circumstances to be such that they justified the deadly force used but his belief that such circumstances existed was unreasonable. The trial court further explained that a person was justified in the use of force intended or likely to cause death or great bodily harm only if he reasonably believed such force was necessary to prevent imminent death or great bodily harm to

himself, and a person who had not initially provoked the use of force against himself had no duty to attempt to escape danger before using force against an aggressor.

¶ 45    After the court finished giving instructions and admonishing the jury, the jury retired to deliberate. The jury sent a note asking for clarification of a mitigating factor that reduced a sentence to second degree murder.  The jury indicated that it agreed that the State met the three items necessary to prove first degree murder, but that mitigating factor used the term unreasonable, which was confusing.  The trial court sent back a note that the jury received all of the instructions in the case; there was no objection by defense counsel. The jury returned verdicts for first degree murder and personal discharge of a firearm.

¶ 46    Defendant filed a motion for new trial, arguing that: (1) he was denied the opportunity to introduce evidence of his state of mind after the conversation with Charlie's companion prior to the shooting; (2) he was not proven guilty beyond a reasonable doubt; (3) the trial court erred in allowing the State to dismiss a juror; (4) the trial court erred in denying defendant's objections to the State's opening, closing and rebuttal arguments; (5) the trial court erred in allowing the State to play the 911 calls to the jury; and (6) the trial court erred in denying defendant's motion for a directed finding at the close of the State's case.  The trial court denied defendant's motion and noted that the record indicated that there was "all types of evidence" presented regarding defendant's state of mind at that particular time.

¶ 47    On August 15, 2018, after hearing evidence in aggravation and mitigation, the trial court sentenced defendant to a 25-year prison term for first degree murder and a 20-year enhancement term for the personal discharge of a firearm that caused the victim's death, to be served

consecutively at 100%, plus a three-year mandatory supervised release period. Defendant's timely appeal followed.

¶ 48                                   ANALYSIS

¶ 49    On appeal, defendant contends that: (1) his conviction for first degree murder should be reduced to second degree murder; (2) he was denied a fair trial where the trial court failed to provide Illinois Pattern Instruction (IPI) 4.13, "definition of reasonable belief," despite the jury's request for clarification on the definition of "unreasonable in the context of imperfect self-defense; alternately, trial counsel was ineffective for failing to request IPI 4.13 (Illinois Pattern Jury Instructions, Criminal, No. 4.13 (4th ed. 2000)); and (3) he was denied a fair trial where the State engaged in a pattern of misconduct during rebuttal argument, that created a serious risk that the jury's verdict was based on a misunderstanding of the law rather than the evidence. We shall examine each of defendant's arguments in turn.

¶ 50                    A. Reduction of Conviction to Second Degree Murder

¶ 51    Defendant first contends that his conviction for first degree murder should be reduced to second degree murder.  He argues that he proved by a preponderance of the evidence that he had an actual, albeit unreasonable, belief in the need for deadly force after he overheard a plot to rob him by Chauncey, the victim's best friend, and two grown men before the shooting, and he was attacked from behind by the deceased. Defendant asserts that he believed that his life was in danger and fired the gun in "desperation." He further asserts that the physical evidence corroborated his testimony that he fired the gun in desperation, namely the abrasions on the victim's face and the projectile damage to the downspout, brick wall and the white car in front of the house. Defendant contends that there is no rational explanation for why he, a college student and security guard with

almost no criminal background, would fire his gun in public. He requests that this court reduce his conviction to second degree murder and remand for resentencing.

¶ 52     The State disagrees, contending that defendant was properly convicted of first degree murder because he failed to prove by a preponderance of the evidence that he had an actual yet unreasonable belief in the need for deadly force. The State maintains that the evidence showed that there was no imminent threat of harm when defendant shot the unarmed victim in the back.

¶ 53     As charged in this case, a person is guilty of first degree murder if he kills an individual without lawful justification and, in performing the acts that cause the death, he "knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2012).

¶ 54     Second degree murder is a lesser mitigated, not a lesser included offense, of first degree murder. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43. A person commits the offense of second degree murder when he commits the offense of first degree murder as defined by paragraphs (1) or (2) of subsection (a) of section 9-1 of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1)-(2) (West 2012)), and either of the following mitigating factors is present:

> "(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or

(2) at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(1)-(2) (West 2012).

¶ 55    The imperfect self-defense mitigating factor is established when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable. *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995). "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is unnecessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2012). There are six elements to a claim of self-defense: "(1) force [was] threatened against a person, (2) the person [was] not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively unreasonable." *People v. Washington*, 2012 IL 110283, ¶ 35.

¶ 56    With respect to second degree murder, the factfinder must first conclude that the State proved beyond a reasonable doubt that the defendant committed first degree murder before the factfinder concludes whether the defendant proved by a preponderance of the evidence one of the mitigating factors required for second degree murder. 720 ILCS 5/9-2(c) (West 2012); *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 3. In this appeal, defendant does not claim that the State failed in its initial burden of proving him guilty beyond a reasonable doubt of first degree murder, thus the only issue for our consideration is whether the trial court should have reduced the murder charge to second degree murder based on defendant's claim of imperfect self-defense. *Castellano*, 2015 IL App (1st) 133874, ¶ 4.

¶ 57    To convict a defendant of first degree murder over his claim of self-defense, the State must prove beyond a reasonable doubt that at least one of the above factors does not apply. *Jeffries*, 164 Ill. 2d at 128. However, when a defendant seeks to mitigate an offense from first degree

murder to second degree murder, he bears the burden of proving the first five elements of self-defense by a preponderance of the evidence. *Castellano*, 2015 IL App (1st) 133874, ¶ 149. A preponderance of the evidence is evidence that renders a fact more likely than not. *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007).

¶ 58    When reviewing a defendant's argument that he presented evidence to prove the existence of a mitigating factor, the reviewing court must consider " 'whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present.' " *Bennett*, 2017 IL App (1st) 151619, ¶ 43, (quoting *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996)).  The factfinder is not obligated to accept a defendant's claim of self-defense; rather, in weighing the evidence, the trier of fact must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and the testimony, if any, of the other witnesses. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002). As when reviewing any challenge to the sufficiency of the evidence, we defer to the factfinder to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts and will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *People v. Willis*, 217 Ill. App. 3d 909, 918 (1991).

¶ 59    After a careful review of the record, we find that the State proved beyond a reasonable doubt that there was no danger of imminent harm to defendant when he shot the victim based on the following.

¶ 60    First, we note that there were considerable age and size differences between defendant and the victim; defendant was a 22-year-old man, and the victim was a 14-year-old boy. Dickerson

described defendant as being a heavyset 38-year-old man, and the record reflects numerous times that the victim was referred to as a little boy. While defendant has not provided this court with the photographs admitted into evidence at his trial that depicted the victim, the State noted in its closing argument that the victim was small, "barely 80 pounds." Defendant, however, indicates in his brief, in relation to his argument for issue three, that the victim weighed 122 pounds according to the medical examiner's report. In contrast, information contained in defendant's presentence investigative report indicates that he was 5 foot, 10 inches tall and weighed 195 pounds. The record does not indicate the victim's height, but according to defendant's statement in his brief, he outweighed the victim by more than 70 pounds. It also bears mentioning that defendant did not testify that the victim was a large teenager.

¶ 61     It is defendant's responsibility as appellant to provide this court with a complete record on appeal, and in the absence of a complete record, any doubts that arise from that incompleteness will be construed against the defendant and every reasonable presumption will be taken in favor of the judgment below. *People v. Banks*, 378 Ill. App. 3d 856, 861 (2007). Here, the photographs of the victim were published to the trial court and jury and admitted into evidence, as was the medical examiner's report, and the jury was able to physically see defendant in court throughout the trial and make any height and size comparisons between the two.

¶ 62     Additionally, while defendant testified to a fight between him and the victim, and the autopsy revealed abrasions to the victim's face and other parts of the victim's body, no one else saw or heard any evidence of a fight or scuffle between the two. Nor did the evidence support any conclusion that the fist fight was in any way serious. Defendant testified that the fight only lasted

between a half-minute to a minute and there was no testimony regarding any injury to defendant, let alone any serious injury, as a result of the fight.

¶ 63    Moreover, defendant testified that he could not hear the conversation that the victim and Chauncey had with Charlie and his companion when the van was in front of the house; he assumed it was about a plot to rob him.  Further, the victim was not present for the "stain" conversation that he overheard behind the garage.  There was no evidence presented of a plot to rob or hurt defendant, nor was there any proof that the victim was part of any alleged plot to rob or hurt defendant. Defendant testified that no one threatened him or took anything from him.

¶ 64    Defendant also testified that he moved the loaded gun from the locked car to the open garage and prepared the gun to be ready for the threat. However, defendant's testimony also revealed that he had multiple opportunities to leave the area or call the police regarding any perceived threat and he did not do so.

¶ 65    Most importantly, defendant's testimony established that the short fist fight he had with the victim had ended before defendant crawled to retrieve the loaded gun and fired shots towards the victim. Witness testimony as well as the physical evidence established that all of the shots were fired from the backyard up the gangway towards the front where the victim, house, and white car were located. Indeed, the fatal gunshot struck the victim in his back as he was running away. There was also evidence presented that defendant did not call the police or render aid; instead, he left the area and went to the west side to hide the gun after asking Chauncey if he "wanted some of this sh*t" or stating that he was "sick of this sh*t."

¶ 66    We find that based on the circumstances presented in this case, defendant failed to meet his burden of establishing by a preponderance of the evidence that he had a reasonable belief that

deadly force was necessary where there was no imminent threat of harm. Accordingly, we will not reduce his conviction to second degree murder, and instead affirm his conviction for first degree murder.

¶ 67                              B. Failure to Give Criminal IPI 4.13

¶ 68     Next, defendant contends that the trial court erred in not *sua sponte* giving IPI 4.13 (Illinois Pattern Jury Instructions, Criminal, No. 4.13 (4th ed. 2000)) in response to the jury's inquiry for clarification about the meaning of unreasonable during its deliberations. He argues that the State misstated the definition of unreasonable belief during its rebuttal argument, which could have confused the jury, thus the additional instruction was necessary. Alternately, defendant contends that his trial counsel was ineffective for failing to request IPI 4.13.

¶ 69     Our review of the record indicates that there was no objection made to the trial court's response to the jury's inquiry nor was this issue included in defendant's posttrial motion. In fact, the record reveals that defense counsel agreed to the judge's response before it was sent back to the jury.

¶ 70     To preserve an issue for review, a party ordinarily must raise it at trial and in a written post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010); *People v. Cregan*, 2014 IL 113600, ¶ 15. This requires that a defendant specifically object at trial and raise the specific issue again in the post-trial motion. *People v. Woods*, 214 Ill. 2d 455, 471 (2005); *People v. Burnett*, 2015 IL App (1st) 133610, ¶ 75. Failure to preserve an alleged error for review is a procedural default. *People v. Rivera*, 277 Ill. App. 3d 811, 818 (1996). As defendant did not properly preserve this issue for consideration on appeal, it is forfeited.

¶ 71    Defendant acknowledges that this issue was not properly preserved for appellate review, and however, asks this court to consider the issue under the plain error doctrine. He argues both that the evidence was closely balanced and that he was denied a fair trial.

¶ 72    The plain error doctrine allows a reviewing court to address defects affecting substantial rights if the evidence is closely balanced or if fundamental fairness so requires rather than finding the claims forfeited. *People v. Woods*, 214 Ill. 2d 455, 471 (2005). Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right. *People v. Dunlap*, 2013 IL App (4th) 11082, ¶ 9; *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 51. A defendant raising a plain error argument bears the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 73    To establish plain error, a defendant must first show that a clear or obvious error occurred (T*hompson*, 238 Ill. 2d at 613), and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error (*People v. Naylor*, 229 Ill. 2d 584, 593 (2008)) or that the error was sufficiently grave that it deprived defendant of a fair trial (*People v. Herron*, 215 Ill. 2d 167, 187 (2005)).

¶ 74    The first step in a plain error review generally is to determine whether the trial court committed error, and the burden is on defendant to establish that an error occurred. *Thompson*, 238 Ill. 2d at 613. However, as previously noted, the record indicates that there was no request for IPI 4.13 nor was there any objection to the trial court's response to the jury. In fact, defense counsel agreed to the trial court's response to the jury. The plain error doctrine does not apply to affirmative acquiescence of the actions taken by the trial court. *Hibbler*, 2019 IL App (4th) 160897, ¶ 51.

¶ 75    According to the record, the jury asked for clarification of a mitigating factor that reduces a sentence to second degree murder because the mitigating factor used the term "unreasonable." The trial court responded to the jury that it received all of the instructions and to keep deliberating. When the trial court asked if there was any objection to its response, defense counsel stated, "That's fine." A party cannot invite an error by the trial court by acquiescing to the manner in which the trial court proceeds and then later claim that the court's actions constituted error. *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 52.

¶ 76    Accordingly, the plain error doctrine is not available for us to consider defendant's claim of error. When defense counsel acquiesces to the trial court's action, a defendant's only challenge may be presented as a claim for ineffective assistance of counsel on collateral attack. *Hibbler*, 2019 IL App (4th) 160897, ¶ 51. As such, we turn our attention to defendant's alternate argument that his trial counsel was ineffective for acquiescing to the trial court response and for failing to request IPI 4.13 in response to the jury's inquiry during deliberation. IPI 4.13 defines "reasonable belief" as follows: "reasonable belief or reasonably believes mean that the person concerned, acting as a reasonable person, believes that the described facts exist."    (Illinois Pattern Jury Instructions, Criminal, No. 4.13 (4th ed. 2000)).

¶ 77    In determining whether a defendant was denied the effective assistance of counsel, this court applies the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984), as adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, and that the deficient performance prejudiced the defendant.  *Strickland*, 466 U.S. at 687; *People v. Gabriel*, 398 Ill. App. 3d 332, 346 (2010).  More specifically, the defendant must

demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Strickland*, 466 U.S. at 694; *Gabriel*, 398 Ill. App. 3d at 346. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *Gabriel*, 398 Ill. App. 3d at 346. Additionally, it is well-settled that counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from ineffective assistance claims. *People v. Douglas*, 362 Ill. App. 3d 65, 75 (2005). However, the failure of an attorney to request a specific instruction can be ineffective assistance of counsel if the instruction was so critical to the defense that its omission denied the right of the accused to a fair trial. *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16. We review such claims *de novo*. *People v. Sanders*, 368 Ill. App. 3d 533, 538 (2006).

¶ 78 Applying those standards to the present case, we find that trial counsel was not ineffective for acquiescing in the trial court's response or in failing to request IPI 4.13 in response to the jury's request for clarification because defendant has not established that he was prejudiced by trial counsel's actions.

¶ 79 The purpose of jury instructions is to inform the jury of the applicable law that applies to the evidence presented in the case. *Herron*, 215 Ill. 2d at 187; *People v. Fuller*, 205 Ill. 2d 308, 343 (2002). Additionally, the trial court has a duty to instruct the jury further when clarification is requested, when the original instructions are insufficient or when the jurors are manifestly confused. *People v. Sanders*, 368 Ill. App. 3d 533, 537 (2006).

¶ 80    In this case, as indicated previously, the jury asked for clarification of a mitigating factor that reduces a sentence to second degree murder because the mitigating factor used the term "unreasonable." Specifically, the jury was given an instruction related to second degree murder which stated, in pertinent part, as follows:

> "* * * The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser included offense of second degree murder instead of first degree murder.  By this I mean that you must be persuaded, considering all the evidence in this case, that it is more probably true than not that the following mitigating factor is present: that defendant, at the time he performed the acts which caused the death of Tommie McNeal, believed the circumstances to be such that they justified the deadly force he used, but his belief that such circumstances existed was unreasonable.* * *"

¶ 81    While it is true that IPI 4.13 provides a general definition for reasonable belief, contrary to defendant's assertion, we do not consider it to be the same as providing clarification for a mitigating factor or the term "unreasonable" standing alone. Thus, we do not agree with defendant's characterization of the question posed by the jury during deliberation, or that IPI 4.13 would have addressed it. This conclusion is supported by the record; the jury's note indicated it found the three elements for first degree murder present and sought clarification on a mitigating factor. This conclusion essentially negates defendant's claim that trial counsel was ineffective for failing to request IPI 4.13.

¶ 82    The record establishes that the trial court properly instructed the jury that it had received all of the instructions in the case and to keep deliberating. Further, defendant has not shown that

IPI 4.13 would have been granted even if requested by his trial counsel. As we have determined that IPI 4.13 would not have been properly given in response to the jury's specific request for clarification, defendant cannot show that the verdict would have been different had the instruction been requested. Thus, he was not prejudiced by trial counsel's failure to request it, and his claim for ineffective assistance of counsel fails.

¶ 83                              C. Prosecutorial Misconduct During Rebuttal

¶ 84    Finally, defendant contends that he was denied a fair trial where the State engaged in a pattern of misconduct during rebuttal, resorting to misstatements of fact, appeals to emotion, and most egregiously, a misstatement of law on the definition of "unreasonable belief" that created a serious risk that the jury's verdict was based on a misunderstanding of the law rather than the evidence.

¶ 85    The record indicates that defendant failed to object to the complained-of remarks and did not raise this issue in his posttrial motion.  Thus, the issue is forfeited. *Rivera*, 277 Ill. App. 3d at 818. However, defendant requests that we review this issue under the plain error doctrine.  He argues both that the evidence was closely balanced and that he was denied a fair trial.

¶ 86    As noted above, the plain error doctrine allows a reviewing court to address defects affecting substantial rights if the evidence is closely balanced or if fundamental fairness so requires rather than finding the claims forfeited.  *Woods*, 214 Ill. 2d at 471. A defendant raising a plain error argument bears the burden of persuasion.  *Thompson*, 238 Ill. 2d at 613.

¶ 87    To establish plain error, a defendant must first show that a clear or obvious error occurred (*Id.*), and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error (*Naylor*, 229 Ill. 2d at 593)

or that the error was sufficiently grave that it deprived defendant of a fair trial (*Herron*, 215 Ill. 2d at 187).

¶ 88    The first step in a plain error review is to determine whether the challenged comments constituted error, and the burden is on defendant to establish that an error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 15.

¶ 89    The State has wide latitude in both its opening statements and closing arguments and may comment on the evidence and any fair, reasonable inferences it yields. *People v. Glasper*, 234 Ill. 2d 173 204 (2009). Prosecutors may not argue assumptions or facts not contained in the record. *Id.* A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *Id.* Statements will not be held improper if they were provoked or invited by the defense counsel's argument. *Id.*

¶ 90    It is improper for the State to make comments that have no other purpose but to arouse the prejudices and passions of the jury. *Guerrero*, 2020 IL App (1st) 172156, ¶ 10. A prosecutor may not misstate the law or attempt to shift the burden of proof to defendant. *People v.* Carbajal, 2013 IL App (2d) 111018, ¶ 31. Even if remarks were inappropriate, reversal is only required if they engendered substantial prejudice against the defendant such that it is impossible to tell whether the verdict of guilt resulted from them. *Guerrero*, 2020 IL App (1st) 172156, ¶ 10. Even prejudicial comments may be cured by the court's proper instructions of law. *People v. Simms*, 192 Ill. 2d 348, 396 (2000).

¶ 91    Defendant first contends that the State relied on improper tactics to counter defense counsel's arguments and distract the jury from the fact that its theory of the case, that defendant was not scared and shot the victim because he was obsessed with his gun was baseless. To support

his argument that the State engaged in improper rebuttal, defendant points to the State's rebuttal argument where it called defense counsel's argument that Angelo's house was a "trap house" insulting, and argues that the evidence presented at trial indicated that Angelo's house was in a high-crime area and that defense counsel's description of Angelo's house was accurate. Next, defendant indicates that the State misstated facts in arguing that the victim barely weighed 80 pounds when the medical examiner's report indicated that the victim weighed 122 pounds. Defendant also takes issue with the State's recitation of a Benjamin Franklin quote, "justice will not be served until those who are unaffected are as outraged as those who are." Defendant argues that these misstatements of facts were made to distract the jury and to appeal to the jury's emotion and constituted reversible error. We disagree.

¶ 92    Reviewing the first challenged comment in context, the record reveals that it was part of a longer statement as follows:

> "You should be insulted by the denigration of the neighborhood of 69th and Vernon. Some of you, none of you, all of you may live in that area. May have never been there. Maybe you have. Okay. It is a residential neighborhood community where people have the right to feel safe and people have a right to live. To come in here and use terms like Mr. Roger's neighborhood and create it in some slum house vicinity trap house that Angelo Howard lives in is nothing less than insulting.
>
> * * *
>
> What type of people lived around 69th and Vernon? Nina Buchanan. Angelo Howard. A [66]-year-old mother. His great uncle. Those are the type of people that they want to denigrate and say the defendant was so scared, so violent and bad, there is nothing

but convicted felons, drugs and guns running around that neighborhood. Really. Because he came in here and told you that it was the first time he was there. He wasn't family with the neighborhood. That he didn't know Angelo. * * *"

¶ 93    We find that the State's comments regarding the "trap house" were invited by defense counsel's argument where she consistently described Angelo's house as such, emphasized the stolen car parked out front, the gun inside of the stolen car as well as Dickerson's statement that it was a bad neighborhood, and stated that "this wasn't Mr. Roger's neighborhood." *Guerrero*, 2020 IL App (1st) 172156, ¶ 19 (citing *People v. Willis*, 2013 IL App (1st) 110233, ¶ 110). The State's remarks were not error.

¶ 94    With respect to defendant's complaint about the State's reference to the victim's weight, we have previously noted that the medical examiner's report was not included in the record filed with this court on appeal. It is defendant's responsibility as appellant to provide this court with a complete record on appeal, and in the absence of a complete record, any doubts that arise from that incompleteness will be construed against the defendant and every reasonable presumption will be taken in favor of the judgment below. *People v. Banks*, 378 Ill. App. 3d 856, 861 (2007). Thus, we are unable to determine if the State misstated the facts concerning the victim's weight. However, as we previously noted, even if defendant is correct about the victim's weight, he outweighed the victim by more than 70 pounds. Thus, the State's emphasis on the size difference between the two was a reasonable inference from the evidence. Additionally, the jury saw photos of the victim and was able to observe defendant as he was physically present in court. We conclude that such remark was not error.

¶ 95 Likewise, defendant's claim of error related to the State's recitation of a Benjamin Franklin quote, "justice will not be served until those who are unaffected are as outraged as those who are," also fails. Defendant argues that such statement was a classic "us versus them" argument and improperly urged the jury to convict him based on their outrage rather than the facts. We note that the comment was part of the section of the State's rebuttal argument quoted above, and also included this statement following the quote: "It doesn't matter if you don't live there."

¶ 96 Our supreme court has held that "a prosecutor may comment unfavorably on the evil effects of crime and urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence." *People v. Nicholas*, 218 Ill. 2d 104, 122 (2006). Our review of the comment in context to the rest of the State's rebuttal yields the conclusion that such statement was not made to inflame the jury's passion but instead to urge it to apply the law despite defense counsel characterization of the neighborhood as a high-crime area. We find no error with the remark.

¶ 97 Defendant further asserts that the State misstated the law when the prosecutor defined unreasonable belief during rebuttal. As noted, previously, during rebuttal the State said:

> "An unreasonable belief in self-defense is something like- I don't know, he threatened me. He went to his waistband and I saw something shiny and I thought it was a gun and I had no choice but to kill him. That's an unreasonable belief.
>
> Okay, maybe we can see how that happened. But it is unreasonable. There is not unreasonableness here. There are no mitigating factors. There is no self-defense here."

Defendant argues that this statement was a misstatement of the law because the law does not require that an aggressor be armed to justify the use of a deadly weapon in self-defense, and further that the jury's confusion was evident in the note it sent during deliberation.

¶ 98     A serious misstatement of the law may require reversal where the evidence is close, even when the defendant fails to object at trial. *People v. Hawkins*, 243 Ill. App. 3d 210, 226 (1993).

¶ 99     The above statement from the State's rebuttal argument appear in context as follows:

"* * * It wasn't a close-range fire. He was killed from a distance with a long range rifle.

There was a struggle.  He was fighting over the gun. And it went off somehow. The gun powder would still be around the bullet wound. And it is not, because it didn't happen that way.

Speaking of struggle, what were the defendant's own words. He said to you we were fighting, we were struggling, wrestling, and I dropped the gun, right. It was two feet away. And I crawled to it. The fight is over. Or there is a break in the fight. I crawled to it. I picked it back up. I turn around, because he's still behind me and I fired at him.

Sounds like first degree murder to me. He didn't know that the weapon was going to result with a probability of death or great bodily harm? That's a weapon of choice for the United States military, ladies and gentlemen. You didn't know that's the destruction that it would cause? After firing it six times. An unreasonable belief in self-defense is something like- I don't know, he threatened me. He went to his waistband and I saw something shiny and I thought it was a gun and I had no choice but to kill him. That's an unreasonable belief.

Okay, maybe we can see how that happened. But it is unreasonable. There is not

unreasonableness here. There is no mitigating factor here. There is no self-defense here.

Just because self defense [*sic*]is available as a defense, doesn't mean the Defendant had a right to avail himself of it, unless the evidence supports it. And none of the other evidence in the case supports that fact.

\* \* \*

Like I told you ladies and gentlemen, think about the things that you didn't hear and think about the things that he did. He never had a right to self defense [*sic*] in this case. \* \* \*"

¶ 100 Reviewing the complained-of remarks in context of the entire rebuttal argument, it appears that the State was attacking defendant's version of self-defense and defendant's version of an unreasonable belief given the other evidence presented at the case, which is not error.

¶ 101 Even if we were to conclude that such statement was error, we would find that it was only harmless error. An appellate court must consider any misstatement of the law in the context and in light of the entire record to determine if it was improper or prejudicial. *People v. Cruz*, 248 Ill. app. 3d 473, 478 (1993). As we previously discussed, the evidence was sufficient to support defendant's conviction for first degree murder. There is no question, after review of the entire record, that this error was not outcome determinative or materially contributed to defendant's conviction as the evidence was not closely balanced. *Hawkins*, 243 Ill. App. 3d at 228. There was considerable evidence presented that negated defendant's theory of self-defense, including defendant's own testimony. Additionally, the trial court fully admonished the jury as to the applicable law in the case, and further, the trial court explained self-defense four times while admonishing the jury. We cannot say that had these particular comments not been made, the jury

might have reached a different result, thus these remarks do not require reversal. *Id.* To constitute reversible error, the remarks must have substantially prejudiced defendant such that absent the remarks the verdict would have been different. Defendant has made no such showing here.

¶ 102                                            CONCLUSION

¶ 103   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 104   Affirmed.